EXHIBIT - A - HABEAS

**MEMORANDUM**

Including;
Table of Authorites,
Table of Contents,
Opening Introduction,
9 Grounds for Relief,
Relevent Facts/Issues and Arguments
EXHIBITS,
Sworn Affidavit

28"

30

TABLE OF AUTHORITIES

29

TABLE OF AUTHORITIES

SIXTH AMENDMENT, UNITED STATES CONSTITUTION
Article III § 14,West Virginia State Constitution
United States V. William Merlino,LEXIS 757132015,U.S.Dist,Mass,(2015)
Strickland v. Washington,466 U.S.668,104 S.Ct.2052,80L.Ed.2d674 (1984)
Lafler V. Cooper,566 U.S.132 S.Ct.1376;182 L.Ed.2d398 (2012)
Missouri V. Frye,566 U.S.132 S.Ct.1399,1407-1408,182 L.Ed.2d379 (2012)
United States V. Rodriguez Rodriguez,929 F.2d 747,753,n.1(1991)
United States V.Gordon,156.F3d 376,380-381(1998)
United States V. Day,969 F.2d 39,43-45(1992)
Buckham V. Wainwright,639 F.2d 262,267(1981)
Julian V. Bartley,459 F.3d 487,498-500 (2007)
Wanatee V. Ault,259 F.3d 700,703-704(2001)
Nunes V. Mueller,350 F.3d 1045,1052-1053(2003)
Williams V. Jones,571 F.3d 1086,1094-1095(2009)
United states V. Morrison,449 U.S.361,365 (1981)


West Virginia Authorities


State ex rel. Strogen V. trent,196 W.Va.148,469 S.E.2d 7 (1996)
State V. Watson,200 W.Va.201,488 S.E.2d 476 (1997)
State V. Miller,194 W.Va.6,459 S.E.2d 117 (1995)
Tucker V. Holland,174 W.Va.409,327 S.E.2d 388 (1985)
Marano V. Holland,179 W.Va.156,366 S.E.2d 177 (1988)
State V. Thomas,157 W.Va.640,203 S.E.2d 445 (1974)
State V. Jenkins,229 W.Va.415,729 S.E.2d 250(2012)
State V. Durham,156 W.Va.509,195 S.E.2d 144(1973)
State V. Roush,95 W.Va.132,120 S.E.304(1923)
State V. Lucas,103 W.Va.743,138 S.E.393 (1927)
State V. Craig,131 W.Va.714,51 S.E.2d 283 (1948)



**TABLE OF AUTHORITIES**

The Double Jeopardy Clause in Article III, Section 5 of the West Virginia Constitution

Article III, § 5 of the United States Constitution.

U.S. v. Lerma, 657 F.2d 786, 789 (5th Cir. 1981) (Unit A) (citing cases). 22 Accord

U.S. v. Mack, 695 F.2d 820 (5th Cir. 1983);

U.S. v. Narciso, 446 F. Supp. 252, 282-83 (E.D. Mich. 1977).

Accord U.S. v. Mack, 695 F.2d 820 (5th Cir. 1983);

U.S. v. Narciso, 446 F. Supp. 252, 282-83 (E.D. Mich. 1977).

United States v. De La Rosa, 171 F.3d 215, 221 (5th Cir. 1999)

United States v. Lindell, 881 F.2d 1313, 1322 (5th Cir. 1989)

United States v. Shaw, 338 F. App'x 404, 408 (5th Cir. 2009)

States v. Rivera, 775 F.2d 1559, 1561 (11th Cir. 1985).

United States v. Cravero, 530 F.2d 666, 670 (5th Cir. 1976)

United States v. Williams, 49 Fed. Appx. 420, 424 (4th Cir. 2002).

Donahue v. Barnhart, 279 F.3d 441, 446 (7th Cir. 2002)

United States v. Kelly, 35 F.3d 929, 933 (4th Cir. 1994)

Napue v. Illinois, 360 U.S. 264, 269, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959)).

United States v. Griley, 814 F.2d 967, 971 (4th Cir. 1987).

23

31

United States v. Kelly, 35 F.3d 929, 933 (4th Cir. 1994)

Napue v. Illinois, 360 U.S. 264, 269, 79 S. Ct. 1173, 1177, 3 L. Ed. 2d 1217 (1959

United States v. Agurs, 427 U.S. 97, 103, 96 S. Ct. 2392, 2397, 49 L. Ed. 2d 342 (1976United States v. Agurs, 427 U.S. 97, 106, 96 S. Ct. at 2399

W. Va. Code § 61-2-1

W.Va. Trial Court Rule 42.02

State V. Jenkins 229 W. Va. 415; 729 SE2d 250729 S.E.2d 250; 2012

State v. Hottle, 197 W. Va. 529, 476 S.E.2d 200, 1996

State v. Giles, 183 W. Va. 237, 395 S.E.2d 481, 1990

State v. Walker, 188 W. Va. 661, 425 S.E.2d 616, 1992

32

24

## OPENING INTRODUCTION TO THE PRESENTATION OF THIS CASE

Comes now the Petitioner, Pro-Se, and moves this Honorable Court to Hear the Case presented in the body of a Petition for a Writ of Habeas Corpus.

The Petitioner herein has submitted a simular Petition on 8/14/15 and was Dismissed by the Honorable Judge Paul T. Farrell due to there NOT being a Direct Appeal Filed in relation to the Conviction(s) that were had for Burglary and 1St Degree Murder on Oct.18,2013 in The Cabell County Circuit Court of West Virginia.

Petitioner avers that there existed a very clear available source of remedies that are inconsistant with each other in the proper way to seek relief(s) for the conviction(s) had as afore mentioned.

Firstly there is the avenue of Relief that could be sought by the filing of claim(s) in a Direct Appeal to the West Virginia Supreme Court of Appeals, However, as has been identified by the Petitioner, The Honorable Justice, Franklin D. Cleckley has proffered in his writtings of the Handbook on WEST VIRGINIA CRIMINAL PROCEDURE, That; **"Ineffective Assistance of Counsel"** Should only be raised in a Petition for Writ of Habeas Corpus rather than in a Direct Appeal since "The allegations of inadequacy of investigation AND improper Trial Strategy are, We believe, **Better addressed in a Habeas Corpus Proceeding** where a Court would have the FULL benefit of an **evidentiary Hearing"**.

25

Secondly there existed the avenue of a Petition for a Writ of Habeas Corpus in which appears to the Petitioner to be the appropriate procedure to seek relief(s) in regards to an Ineffective Assistance of Counsel claim, As is proffered by the most Honorable Justice, Franklin D. Cleckley as; "Claims of Ineffective Assistance of Counsel are primarily bottomed on the facts which **CAN NOT** be adequately determined from the Appeal record. These claims are more satifactorilly resolved through a Habeas Corpus proceeding, As many Jurisdictions have already recognized that, Appellate Review of an Ineffective Assistance of Counsel Claim is de novo".

Therefore, With the Petitioner being compelled Under a Doctrine of Waiver by Election of Remedies, The general Rule is; That when the choice is once actually made between inconsistant theories and Remedies, It operates as a bar, And the Suitor will **NOT** be allowed to invoke the aid of the Court upon contradictory principles of redress upon one, And the same line of acts, The Doctrine requires the party **CHOOSE ONE** Remedy over another, **KNOWINGLY**, "When a party has two (2) Remedies inconsistant with each other, ANY Decisive act by Him, done with knowledge of His rights and of the facts, Determines once for all His remedy".

A Waiver By Election's Rule applies when (3) Three elements do coincide: (a) Two (2) or more remedies **MUST** exist,(b) The available Remedies **MUST** be inconsistant,[AND](c) Choice of one(1) Remedy and it's pursuit to conclusion **MUST** be made.

34

2L

Therefore, The Petitioner herein filed a WAIVER OF DIRECT APPEAL on 12/15/15 with the Cabell County Circuit Court's Clerk, and also forwarded a true copy of such to the West Virginia Supreme Court of Appeals, to be made a matter of "Record".

Petitioner further contends that as He seeks the Relief(s) as described herein this Petition, He is in belief that He has met the three (3) Requirements needed to establish the **NEED** for the Doctrine of Waiver By Election of Remedies as; (1) Two remedies are in existance to pursue the Ineffective Assistance of Counsel Claim, Either by a Direct Appeal, or secondly by a Petition for a Writ of Habeas Corpus,(2)The available Remedies are **INCONSISTANT**, As the West Virginia Supreme Court RECOMENDS thatn the Issue of Ineffective Assistance of Counsel be addressed in a Habeas Corpus,[AND] (3) The choice of one Remedy, [AND] It's persuit to **CONCLUSION MUST BE MADE**, as the Petitioner HAS chosen to seek Relief(s) in the Petition for Writ of Habeas Corpus and has entered a WAVER OF DIRECT APPEAL so as to properly proceed.

Petitioner avers that He has exercised His Right to Due Process in His WAIVER OF A DIRECT APPEAL, in accordance to the Doctrine Of Waiver By Election Of Remedies so as to present the ISSUE of Ineffective Assistance Of Counsel as was proffered by the most Honorable Justice, Franklin D. Cleckley in this Petition for a Writ of Habeas Corpus in seeking the Relief(s) for the Conviction(s) had for BOTH Burglary and First Degree Murder, and is Presented Respectfully, Pro-Se as Follows;

35

27

Petitioner then Filed a successive Petition on 12/2/2016, which has been declared to be "SUSPENDED" indefinitely by Judge Paul T. Farrell and by such suspension there exists a potential Time tolling issue against the Petitioners 1 year statute of limitations pursuant to the AEDPA standards, and in furtherance, Petitioner was advised by Counsel that there was a possibility of the time tolling being intentional so as to cause the Petitioner the denial of filing for relief in a Federal Court in challenging the Conviction(s) which were had within Judge Paul T. Farrell's Court on 10/18/2013.

Petitioner has attempted to file a Writ of Mandamus on 8/5/2016, to compel Judge Paul T. Farrell to NOT suspend the right of the Habeas Corpus and to either allow the proceedings to be had without delay or to recuse himself from hearing the Case, OR to show cause why the Petition for Writ of Habeas Corpus has been SUSPENDED and delayed, which was determined by a West Virginia Supreme Clerk to be forbidden and successive, in which it is not, offered herein as [EXHIBIT MANDAMUS].

Petitioner then presented to this Honorable Court a Motion for Stay and Abeyance in order to preserve the Issues and Grounds presented at the initial State Habeas Corpus and was ORDERED on 8/4/2016 to file a 2254 Petition setting forth the grounds for relief by 9/5/2016, an pursuant to said ORDER the Petitioner presents the following;

B-9

36



GROUNDS FOR RELIEF

29

## GROUND(s) OF THE INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

1). The failure of defense Counsel to conduct **ANY** Investigation(s), or to call **ANY** Witnesses, or to introduce **ANY** evidence Whatsoever to corroborate Defendent's testimony of the underlying events that ultimately led to Defendant's conviction of **BOTH** Burgalry and for First Degree Murder resulting from a single criminal act, occerance, episode or transaction, Constituting the "**Ineffective Assistance of Counsel**" which failure was **BOTH** inadequate and such inadequacy had prejudiced the outcome of this Case.

2). Defense Counsel's failure to understand the Law set forth in the Court's So-Called "**Jenkins Charge**" to the Jury, and Counsel's failure to explain that precedent to the Defendant when He decided to reject the State's Plea Offer, was very prejudicial to this case and Constitutes the "**Ineffective Assistance Of Counsel**" In Violation of the **Sixth Amendment** to the United States Constitution and Article III, § 14 of The West Virginia State Constitution.

3). Defense Counsel's offering Expert Testimony in Defense of his very apparent mistake in Law that was a result of the Convictions in this case as to **1St Degree Murder** and Burglary.

30

4). Defense Counsel's FAILURE and REFUSAL to conduct a meaningfull investigation into the Petitioner's extensive history of mental and psychological disorders, and in refusing to Motion the Court for a psychological evaluation after being made aware of previous history of psychological disoreders and a suicide attempt while awaiting Trial.

5). Failure by Defense Counsel to Object to the State's knowing use of perjured testimony and the presentment of such by prosecutor Chris Chiles while aware that such testimony was in fact perjured, false, fabricated and fraudulent and IMPOSSIBLE according to all relevent Medical reports, Police Reports, Autopsy Reports, Paramedic Reports that were in possession of BOTH, the State's prosecutor and the Appointed Defense Counsel PRIOR to and during Trial.

---

OTHER GROUNDS INCLUDED AS:

6). The State's Knowing Use of Perjured Testimony, where the State's Prosecutor, Chris Chiles did knowingly and intentionally present the false, fabricated, perjured testimony of a State's Witness to the Court and its Juror's so as to cause an intentional prejudicial impact on the Juror's decision and verdict and determination of guilt.

7). Court's Abuse of Discretion by not proclaiming and initiating a Doctrine of Inherent Incredibility and limit the perjured testimony being presented by the State's Witness, while the Court was aware that the events were physically impossible in the description of the injuries inflicted upon the victim, and also allowed the prosecution to lead the perjured testimony while being aware that such was false, perjured aND IMPOSSIBLE as Medical Records clearly established.

3/

8). Prosecutorial Misconduct and a Denial of fundamental fairness by the State's knowing use of Perjured testimony and offering such intentionally.

9). Double Jeopardy, by Convicting the Petitioner for BOTH 1st Degree Murder and Burglary under a Felony Murder theory and in not presenting instructions that distinguish between 1st Degree Murder and Felony Murder.

---

The Petitioner herein offers the following in support to the aforementioned GROUNDS for which he seeks Relief.

39

3)

RELEVENT FACTS ISSUES AND ARGUMENTS

33

The Sixth Amendment to the United states Constitution and Article
III, § 14 of The West Virginia State Constitution, assure not only
the Assistance of Counsel in a Criminal Proceeding, but these
Constitutional provisions mandate "competent and effective assistance
of counsel"; State ex rel.Strogen v. Trent196,W.Va.148,469 S.E.2d 7(1996),

In order to prevail on an ineffective assistance claim, the Petitioner
MUST establish a two prong test, adopted and announced by the United
States Supreme Court in Strickland v. Washington,466 U.S. 668,104 S.Ct.
2052,80 L.Ed.2d 674(1984) As follows;
1). Counsel's Performance was deficient under an objective standard
of reasonableness; And,
2). There is a reasonable probability that, but for Counsel's
unprofessional errors, the result of the proceedings would have been
different.
Lafler v. Cooper,566 U.S.132 S.Ct.1376;182 L.Ed.2d 398(2012),In the
referencing of Strickland, Supra. See also, Missouri v. Frye,566 U.S.
132 S.Ct.1399,1407-08,182 L.Ed.2d 379(2012), State v. Miller,194,W.Va.
6,459 S.E. 2d117(1995); Tucker v. Holland,174,W.Va.409,327 S.E.2d388
(1985); Marano v. Holland,179,W.Va.156,366 S.E.2d117 (1988) ; State
of West Virginia v. Thomas, 157W.Va.640,203 S.E.2d 445(1974).

In making this determination, the Court MUST apply an "objective
standard", that standard requires an analysis of the FACTS and
circumstances in the Trial below, including a determination of whether
the "act's or omission's" were outside the broad range of professionally
competent assistance while at the same time refraining from engaging
in Hindsight or second guessing of Trial Counsel;s strategic decisions".

41(

34.

State v. Miller,194 W.Va.6,459 S.E.2d 117(1995) ; Lafler v. Cooper, 566 U.S. 132S.Ct.1376;182 L.Ed.2d 398(2012) ; State ex rel.Strogen V. trent,196 W.Va.148,469 S.E. 2d 7(1996) ; State v. Watson,200 W.Va. 201,488 S.E. 2d 476(1997), The ultimate inquiry, then,is whether a "reasonable Lawyer" would have acted in a similar manner under the circumstances at issue.

This Court has consistantly HELD that this determination MUST be "highly Deferential and Prohibiting intensive scrutiny of Counsel and rigid requirements for acceptable assistance",State v. Miller, 194 W.Va. 6,459 S.E. 2d 117(1995), Citing Strickland v. Washington, 466 U.S.668,104 S.Ct.2052,80 L Ed.2d 674(1984); And, one"key Fulcrum" to this analysis is Defense Counsel's "Investigation of the case, which would enable him to make informed decisions about how best to represent criminal client's".

The latest Decision regarding Lafler v. Cooper And Missouri v. Frye, Claims of "ineffective Assistance of Counsel in relation to plea agreements was HAD on June 11, 2015,United States Of America V. William Merlino, United States District Court For the District Of Massachusetts,2015 U.S. Dist. Lexis757132015, Criminal Action No. 99-10098, Filed and Decided June 11,2015, As it was HELD; A Defendant MUST show that, but for the Ineffective Advice of Counsel there is a reasonable probability that the plea offer would have been presented to the Court (i.e., That the defendant would have accepted the plea, and the Prosecution would not have withdrawn in light of the intervening circumstances), That the Court would have accepted it's terms, and that the conviction or sentence, or BOTH under the offers terms would have been less severe than under the Judgement and Sentence that in fact were imposed.

35

4b

And further HELD IN <u>United states Of America V. William Merlino;</u> The Court **AFFIRMED** the Sixth Circuit's ORDER of Specific Performance of the original Plea Agreement. Since the goal of a remedy is to "Neutralize the taint' of a Constitutional Violation".

<u>State ex rel. Strogen v. trent,196 W.Va.148,469 S.E.2d 7(1996)</u> ;
Justice Scalia with whom Justice Thomas joins, and with whom the Chief Justice joins to all but part IV, Dissenting," If a Plea Bargain has been offered, a defendant has a **right** to effective assistance of counsel in considering whether to accept it" " If that **right** is denied", Prejudice can be shown if loss of the Plea opportunity led to a Trial resulting in a conviction on more serious charges OR the imposition of a more severe sentence" Ante, at 9, <u>Lafler v. Cooper,</u> <u>566 U.S.132 S.Ct.1376;182 L.Ed.2d 398 (2012).</u>

In this Case it has been established that the State **"Ambushed"** Defense Counsel with the So-called "Jenkins Charge" and the Court allowed the instruction after the Deadline set, and all testimony was had.

## THE "JENKINS" INSTRUCTION

The evidence in this case established that someone allegedly beat the victim and that He required surgery to adress injuries, During a second surgery approxamately 9 days after the alleged beating incident the victim suffered a Cardiac Arrest and went into a coma, never recovering from surgery, His family "PULLED THE PLUG" on Life Support and the victim died thereafter.

43



At Trial the Court delivered the following So-Called "Jenkins Charge" Instruction to the jury:

The Court instructs the Jury that to be GUILTY of murder, it is NOT necessary that the wounds be the DIRECT cause of Death, It is sufficient if the initial wound or wounds caused Death indirectly through a chain of natural causes, The criminal responsibility is not lessened by the Pre-existing physical condition of the person killed, it is also inmaterial that the accused did not know that the victim was in a feeble condition which facillitated such killing.

State of West Virginia v. Jenkins,229 W.Va.415, 729 S.E. 2d 250(2012); State V. Durham,156 W.Va.509,195 S.E. 2d 144 (1973) ; State V. Roush, 95 W.Va.132,120 S.E.304(1923) ; State V. Lucas,103 W.Va.743,138 S.E. 393(1927) ; State V. Craig,131 W.Va.714,51 S.E.2d 283(1948), This instruction was based on CASE Law that has existed for OVER 75 years in West Virginia, It is well settled "Black Letter Law", Yet the Defense was unaware that such Law existed and did not explain it to the Defendant when the State's Plea Offer was pending.

Moreover, Defense Counsel admitted to the Court that He was surprized by the Instruction, That He DID NOT explain the Law to the Defendant and that His Strategy was "OBLIVIATED" by the ERROR.

On that point, Defense Counsel told the Court:

" I have since been provided with a copy of that Case, I have read it, I have studied it, I have studied it's predecessor, The Durham Case, and  IF that had been presented to me the week BEFORE Trial, as required by your Honor, Then CERTAINLY I would have consulted with Mr. Dreyfuse accordingly, And it may have made a difference, In NOT only His strategy

44                                                                    37

But also in His desire to take the state's Offer, IT's VERY-
Judge, I can NOT overstate the FORCE of that Jenkins Charge and the
effect it had on, I'm sure it had on the Jury, and also Mr.Chiles
was able to very, very effectively argue that in his closing and
was able to mold his examination of His witnesses, His Medical
Experts as well as His cross Examination of OUR Expert around the
FACTS of the Jenkins Case and the instruction it produced".[emphasis].
**SEE JENKINS TESTIMONY IN SUPPORTING TRANSCRIPTS**
** MARKED AS EXHIBIT FLASH***

The Affidavit from Mr.Dreyfuse confirms what Defense Counsel told
the court at the Post-Trial Hearing Motion. Specifically, It confirms
that Mr.Dreyfuse was NOT AWARE of the Legal significance of the
"Jenkins" instruction OR the existance of the "Black Letter Law"
that supported the instruction, either before He rejected the State's
Plea Offer of 30 Years FLAT for a No Contest Plea to 2nd Degree
Murder and in return the State woud DISMISS Burglary and NOT seek
a recividist, OR at the time the Court GRANTED the State's Jenkins
instruction, Following trial.

Indeed, As evidenced by Mr. Dreyfuse's Affidavit, He was under the
distinct impression from his Defense Counsel that the State had to
show that the victim died DIRECTLY as a result of injuries that He
inflicted, Which most definately DID NOT include a Heart Attack 9
days after the initial event. That was the ENTIRE basis of his
Murder defense and Strategy, assuming the Jury did NOT accept His
uncorroberated testimony that He was beaten, and Robbed by two of
the State's witnesses that testified against Him, A total of (16)
sixteen Potential witnesses for Mr. Dreyfuse's defense were NEVER

14

Interviewed, Investigated OR called to Trial by subpoena to corroborate Mr. Dreyfuse's testimony and to facts that exonerated Him, *NOT (1) ONE WAS EVER CALLED*

Importantly, When the Court accepted the state's Jenkins Charge, Mr. dreyfuse did NOT have the optionof accepting the State's Plea Offer, which had been withdrawn when the Trial began.

According to Mr. Dreyfuse's Sworn Statement, If His Defense Counsel had adequately informed him of the **LAW** reflected in the Jenkins instruction, Then He would have SURELY accepted the State's Plea Offer, If that would have occured, He would have faced a **(30) Thirty** year determinate Sentence,That the State was **WILLING** to accept, Instead of a Life without Mercy and a consecutive 1 to 15 years Prison Sentence on the underlying Burglary, FOR GOOD MEASURE.....

In addition to the Jenkins ISSUE, Defense Counsel failed to investigate or to otherwise introduce ANY evidence to support Defendant's Trial testimony, Such evidence existed in state's witnesses recorded interviews with Detective(s), and also per Defendant, Who simply conceded on cross examination that His Defense had NO corroberating evidence, OR witnesses, Which Mr. Chiles Prejudicially TITLED the testimony of Mr.Dreyfuse-"A FAIRY TALE"-A Story NOT supported by ANY evidence or a **SINGLE** Defense Witness...

For example, Defendant testified that He called an old Girlfriend, Karen Johnson, who resided in Parkersburg West Virginia, and that they were re-kindling an old flame, The defendant also told Ms. Johnson His accounts of the events that was consistant with his Trial testimony that He was a victim of a Brutal beating, stabbing and Robbery, and NOT a perpatrator of the same, And that Ms. Johnson

46                                                                                      39

Seen ALL of the SEVERE bruising from his being beaten with a ball bat, and that she also helped treat the (2) two stab wounds and recomended that Mr. dreyfuse seek Medical treatment, And further testimony established that Mr. Dreyfuse was residing with Ms. JOhnson while he was seeking employment, Mr.Dreyfuse also testified that He interviewed for employment at Penzoil and AIRtight Bail Bonds BOTH located on 7th Street in Parkersburg among many other places while rekindling His relationship with Ms. Johnson.

Mr. Dreyfuse testified that a friend, Duane Cooners traveled from Parkersburg to Huntington in order to take Mr. dreyfuse back to Parkersburg and Ms. johnson, And that He told Mr. conners the exact same accounts of the events, and that His friend was also very concerned with Mr. dreyfuse's Medical condition, Dfense Counsel NEVER attempted to contact, interview or subpeona EITHER, Ms. Johnson OR Mr. Conners.

**Mr. Dreyfuse** also testified that He told Sgt.Allen, of the Wood County Sherrif's Office that He was surprized to be arrested because He was a victim in a Beating, Stabbing and Robbery, NOT the other way around, and also showed Sgt. Allen the Bruises and stab wounds suffered from His being robbed and attacked, Mr. Dreyfuse's Counsel did NOT subpeona Sgt. Allen **EITHER.** Moreover, Defense Counsel did **NOT cross-examine** Deputy Swiger, The other Officer involved in the aprehension of Mr. Dreyfuse in Parkersburg about His CRUCIAL corroberating evidence, even though He WAS available at Trial, albeit by a State issued subpoena.

Defense Counsel apparently did **NOT** investigate or interview the
Clerk at Go-Mart, and He definately did **NOT** subpoena Him even
though Mr. dreyfuse encountered Him imediately after the attack!,
in a beaten, bloody, Stabbed condition at which time He told the
Clerk the **DETAILS** of His being a victim of a Robbery, NOR did Defense
Counsel subpoena the **VIDEO** from Go-Mart which would have SHOWN that
Mr. Dreyfuse was in a Beaten, Bloody, Stabbed condition, which would
have been wholly INCONSISTANT with the accounts of ALL the state's
witnesses.

Defense Counsel did **NOT** investigate, interview or subpoena Mr. Dreyfuse's
Room mate/LandLord, Who Mr. Dreyfuse testified had helped Him undress
and treated the wounds incurred during His being Robbed, beaten and
Stabbed, and also told Mr. Martin the exact same accounts of the
events as to how He was set up to be robbed, being attacked and of
His narrowly escaping and running to Go-mart, (3) three houses away
from where the attack and robbery happened so that He was in the
LIGHT and in PUBLIC, SAFE, and STAYED there for at least (10) **TEN**
**Minutes** to insure that He was not being further persued by His
attackers, Defense Counsel also did **NOT** subpoena **VIDEO** from the
security Dept. at the Apartment complex, which also would have shown
Mr. Dreyfuse in a Beaten, Bloody, stabbed condition from at least
(8) eight different VIDEO camera's throughout the complex that would
have recorded the entry and travel from the entrance, elevator, Hall
ways, and even the process of Mr. dreyfuse gaining security clearence
to the main lobby's entrance ina hoorid condition, along with the
TIMESTAMPS of the VIDEO to corroberate the time that passed from

6/1

6/8                                                    17

the NON investigated or subpoena'd Go-Mart Video in comparison to the Non investigated or subpoena'd apartment Video that would corroberate the passing of (10) **TEN MINUTES**, timestamp from go-Mart would also establish Mr. dreyfuse's being at Go-Mart for at least (10) TEN MINUTES and would have also been a reference of where Mr. dreyfuse was or had BEEN when the call to 911 was actually made, and would have corroberated Mr. dreyfuse's testimony of such events which would have been wholly INCONSISTANT with the accounts of all the State's witnesses.

Defense Counsel also allowed the state's witnesses to be led around relentlessly by the Prosecutor, It got so bad that the court chimed in several times, admonishing the Prosecution to "STOP LEADING", thus the State's case was at times "Manufactured" soley on leading questions and Defense Counsel essentially allowed the Prosecutor to build His case and to rehabilitate ANY wayward testimony through the use of leading questions with NO OBJECTIONS being made to such by Defense Counsel.

Defense Counsel's FAILURE to understand the Jenkins Law, Allowing the Prosecution to lead the witnesses and the failure to investigate the factual basis of Mr. Dreyfuse's defense, As well as Defense Counsel's failure to subpoena ANY witnesses, OR otherwise offer **ANY** evidence to corroberate Defendant's version of the underlying events cemented Mr. Dreyfuse's Convictions for Burglary and 1St Degree Murder.

18

49

Standing alone, Mr. Dreyfuse was litterally a sitting Duck in a Pond within feet of a Duck Blind occupied by a Particularly well-armed and capable Hunter, He didn't have a Sporting Chance.

If defense Counsel would have properly investigated the Defense of this claim, and offered evidence to corroberate Mr. Dreyfuse's testimony this evidence would have CERTAINLY cast reasonable doubt on the version painted by the Prosecutor's "leading testimony" of the State's lay witnesses, This is not 20/20 Hindsight or Monday Morning quarter backing, Nor is it the spinning of a "fairy Tale", It is a fundamental breakdown in a mans Constitutional Right to Competent Counsel. Compounding matters is the FACT that Defense Counsel BUILT their ENTIRE defense around a **MISTAKE IN LAW**; That is, They thought a Murder Conviction could NOT stand if the victim did NOT die as a result of injuries inflicted by being beaten.
Even the State's Doctor's admitted that the victim DID NOT die as a direct result of injuries inflicted by an assault, it is clear from the record that He died AFTER he suffered a Heart Attack during an Orthopedic procedure.
Defense Counsel's strategy was built around an **OBVIOUS** mistake in Law, and in NOT advising the Defendant of the "Black Letter Law" existing for well **OVER** 75 years, "That to be guilty of murder, it is not necessary that the wounds be the direct cause of death" resulted in Mr. Dreyfuse's refusal of the State's Plea Offer, and constitutes Ineffective Assistance of Counsel arising out of the Plea Negotiation process; Here the ineffective assistance led not to an Offer's acceptance but to it's rejection, having to stand trial, not choosing to waive it, is the prejudice alleged.

43

In these circumstances a Defendant **MUST** show that but for the ineffective advice of Counsel there is a reasonable probability that the Plea Offer would have been presented to the Court,(i.e., That the defendant would have accepted the Plea and the Prosecution would not have withdrawn in light of intervening circumstances), That the Court would have accepted it's terms, and that the conviction or sentence, or BOTH, under the Offers terms would have been less severe than under the Judgement and sentence that in fact were imposed. **Lafler V. Cooper,566 U.S.132 S.Ct.1376;182 L.Ed.2d.398(2012)**; And further states, Here the Court of Appeals for the Sixth Circuit agreed with that test for **Strickland** prejudice in the context of a rejected Plea Bargain, This is consistant with the test adopted and applied by other Appellate Courts without demonstrated difficulties or systemic disruptions, **United States V. Rodriguez Rodriguez,929 F.2d 747,753,(1991)**, (per Curiam); **United states V. Gordon,156 F.3d 376,380-381(1998)** ; **United States V. Day,969 F.2d39,43-45(1992)**; **Beckham V. Wainwright, 639 F.2d 262,267(1981)**; **Julian V. Bartley,495 F.3d 487,489-500(2007)**; **Wanatee V. Ault,259 F.3d 700,703-704(2001)**; **Nunes V. Mueller,350 F. 3d 1054,1052-1053(2003)**; **Williams V. Jones,571 F.3d 1086,1094-1095(2009)**, The Strickland prejudice test requires a Defendant a reasonable possibility that the outcome would have been different with competent advice.

Where a defendant shows ineffective assistance has caused the rejection of a Plea leading to a more severe sentence at Trial, the remedy **MUST** "neutralize the Taint' of a Constitutional Violation, **United States V. Morrison,449 U.S.361,365.**

20

## CONCLUSION

For the foregoing reasons, Defendant Respectfully Submitts that He has established that His defense Counsel's performance was Deficient under an objective standard of reasonableness, and that there is a reasonable probability that, but for Counsel's unprofessional error's the results of the proceedings would have been different.

Insofar as the Ineffective Assistance of counsel was indeed outcome Determinitive, And Violate the defendant's Constitutional Rights Under the Sixth Amendment of The United states constitution, And Article III § 14 Of The West Virginia state Constitution, This Matter should be REMANDED and the Conviction(s) REVERSED and a New trial should be GRANTED.

## RELIEF(s) SOUGHT

Petitioner's Conviction(s) for Burglary and 1St Degree Murder Should Be VACATED and the Case Should Be REMANDED to the Cabell County Circuit Court for the Specific Performance of the State's Original Plea Offer, as to Neutralize the Taint' of the Constitutional Violations, AND that this Honorable Court REMAND this MATTER with Instructions for a New Trial should the state's Offer be REFUSED by the Petitoner and He Chooses to go back to Trial.

Petitoner contends that this case is Ripe for an Omnibus Discovery Hearing so as to Establish the Record, and Requests that such be ORDERED by this Court so as to seek Appropriate Relief(s).

45

52

**INEFFECTIVE ASSISTANCE OF COUNSEL**

**FAILURE AND REFUSAL TO MOTION COURT FOR PSYCHIATRIC EVALUATION;**

Counsel  REFUSED to investigate the history of the Petitioners mental health and psychological disorders which were obvious by record and evidenced with previous attempted suicides and other serious psychological disorders that were relevant to the Petitioner/ Defendant's competency, and furthermore Counsel REFUSED to Motion the Court for a Psychological Evaluation of the Petitioner/Defendant after being made aware of a life long history of serious mental and psychological problems as offered in **[EXHIBIT-MENTAL HISTORY]**, including a suicide attempt while awaiting Trial.

**W. Va. Code § 27-6A-1(a)** provides for only two methods of conducting a mental examination to determine a defendant's competency: **(1)** an examination by one or more psychiatrists or **(2)** an examination by a psychiatrist and a psychologist. The Supreme Court of Appeals of West Virginia has previously considered the requirements of this statute and held: In the interests of future judicial economy, whenever a trial court is confronted with a Motion for Mental Status Evaluation and orders an examination believing that the defendant may be incompetent or insane, the court should order that said examination shall be conducted by one or more psychiatrists, or a psychologist and a psychiatrist, in accordance with **W. Va. Code, 27-6A-1.**

A defendant has both a substantive and a procedural due process right to avoid being tried while mentally incompetent. In order to bring a successful substantive competency claim, a defendant must prove that he or she was, in fact, incompetent at trial.

In a procedural due process claim based on incompetence, a defendant need only demonstrate that he or she was denied an adequate procedure for determining mental competency after the trial court was presented with evidence sufficient to prompt good faith doubt regarding incompetency.

46

53

Since the right not to be tried while mentally incompetent is subject to neither waiver nor forfeiture, a trial court is not relieved of its obligation to provide procedures sufficient to protect against the trial of an incompetent defendant merely because no formal request for such has been put forward by the parties. In other words, a trial court has an affirmative duty to employ adequate procedures for determining competency once the issue has come to the attention of the court, whether through formal motion by one of the parties or as a result of information that becomes available in the course of criminal proceedings.

Competency to Stand Trial, Evidence of irrational behavior, a history of mental illness or behavioral abnormalities, previous confinement for mental disturbance, demeanor before the trial judge, psychiatric and lay testimony bearing on the issue of competency, and documented proof of mental disturbance are all factors which a trial judge may consider in the proper exercise of his or her discretion to order an inquiry into the mental competence of a criminal defendant.

W. Va. Code § 27-6A-1(a) permits a magistrate or judge to order a psychiatric evaluation whenever there is sufficient cause to believe that a defendant is either incompetent to stand trial or not criminally responsible for the charged offense due to mental illness, mental retardation, or addiction. Significantly, the statute sanctions such recourse at any stage of the proceedings after the return of an indictment or the issuance of a warrant or summons against the defendant.

Competency to Stand Trial Even when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a chance that would render the accused unable to meet the standards of competence to stand trial.

47

54

Thus, the fact that a defendant has been afforded a mental status evaluation and later been found competent to stand trial following an adversarial hearing does not relieve a trial court of its responsibility to remain watchful and vigilant as to the possibility that the defendant may lapse into incompetency during the course of subsequent proceedings.

Competency to Stand Trial Because a trial court is able to observe the demeanor of the defendant and consequently has a better vantage point than the appellate court to make determinations regarding mental competency, the appellate court will disturb a lower court's ruling denying a psychiatric examination and related proceedings only where there has been an abuse of discretion.

Pretrial Motions > Competency to Stand Trial When a trial judge is made aware of a possible problem with defendant's competency, it is abuse of discretion to deny a motion for psychiatric evaluation.

In order to demonstrate that a trial court abused its discretion in refusing to afford a defendant additional competency proceedings, the defendant must show facts such that a reasonable trial judge should experience doubt about the accused's continued competency to stand trial.

A court may conclude that a motion for mental examination under **W. Va. Code § 27-6A-1(a)** is not warranted based upon the fact that there is insufficient evidence to indicate that the defendant is incompetent. If this is done, the court should state its findings on the record. **W. Va. R. Crim. P. 12(e).**

When a trial judge is made aware of a possible problem with defendant's competency, it is abuse of discretion to deny a motion for psychiatric examination.

48

53

A judge may be made aware of a possible problem with defendant's competency by such factors as: a lawyer's representation concerning the competence of his client; a history of mental illness or behavioral abnormalities; previous confinement for mental disturbance; documented proof of mental disturbance; evidence of irrational behavior; demeanor observed by the judge; and, psychiatric and lay testimony about competency.

"When a trial judge is made aware of a possible problem with defendant's competency, it is abuse of discretion to deny a motion for psychiatric examination. To the extent **State v. Arnold**, 159 W. Va. 158, 219 S.E.2d 922 (1975), differs from this rule, it is overruled." In reaching this conclusion, we stated:

"A judge may be made aware of a possible problem with defendant's competency by such factors as:

a lawyer's representation concerning the competence of his client;

a history of mental illness or behavioral abnormalities; previous confinement for mental disturbance; documented proof of mental disturbance; evidence of irrational behavior; demeanor observed by the judge; and, psychiatric and lay testimony about competency.

 **State v. Arnold**, supra 219 {318 S.E.2d 608} S.E.2d at 926, citin**g: Drope v. Missouri**, 420 U.S. 162, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975**); Pate v. Robinson,** 383 U.S. 375, 86 S. Ct. 836, 15 L. Ed. 2d 815 (1966). These factors are restated in **State v. Milam**, 159 W. Va. 691, 226 S.E.2d 433 (1976)." W. Va. at n.9, 270 S.E.2d at 656, n.9.We believe, as we indicated in Echard, that genuine attempts at suicide constitute evidence of irrational behavior.  When these acts are brought to the attention of a trial judge, he should order a psychiatric examination of a defendant.  Under the circumstances of this case, the trial judge abused his discretion in failing to order a psychiatric examination of the defendant.

49

56

When a trial judge is made aware of a possible problem with defendant's competency, it is abuse of discretion to deny a motion for psychiatric evaluation." Syl. pt. 4, in part, **State v. Demastus**, 165 W. Va. 572, 270 S.E.2d 649 (1980).

Genuine attempts at suicide constitute evidence of irrational behavior.  When these acts are brought to the attention of a trial judge, he should order a psychiatric examination of a defendant." Syl. pt. 2, **State v. Watson**, W. Va, 318 S.E.2d 603 (1984). The test for mental competency to stand trial and the test for mental competency to plead guilty are the same." Syl. pt. 2, **State v. Cheshire**, 170 W. Va. 217, 292 S.E.2d 628 (1982).

It is a fundamental guaranty of due process that a defendant cannot be tried or convicted for a crime while he or she is mentally incompetent." **State v. Cheshire**, 170 W. Va. 217, 219, 292 S.E.2d 628, 630 (1982).Competency evaluations should be ordered to be performed by one or more psychiatrists or a psychologist and a psychiatrist, in accordance with **W. Va. Code § 27-6A-1.**

This Court has long since recognized that "an accused person, although he may have been sane at the time of the acts charged, cannot be tried, sentenced or punished while mentally incapacitated." Syllabus Point 1, **State v. Arnold**, 159 W. Va. 158, 219 S.E.2d 922 (1975), overruled on other grounds by **State v. Demastus**, 165 W. Va. 572, 270 S.E.2d 649 (1980). In fact, "'it is a fundamental guaranty of due process that a defendant cannot be tried or convicted for a crime while he or she is mentally incompetent.' **State v. Cheshire,** 170 W. Va. 217, 219, 292 S.E.2d 628, 630 (1982)." syllabus point 5, **State v. Hatfield**, 186 W. Va. 507, 413 S.E.2d 162 (1991).

30

57

Moreover, "No person may be subjected to trial on a criminal charge when, by virtue of mental incapacity, the person is unable to consult with his attorney and to assist in the preparation of his defense with a reasonable degree of rational understanding of the nature and object of the proceedings against him." Syllabus Point 1, **State v. Milam,** 159 W. Va. 691, 226 S.E.2d 433 (1976). Syllabus Point 6, State v. Barrow, 178 W. Va. 406, 359 S.E.2d 844 (1987).

Accordingly, this Court has stated that "a trial court has an affirmative duty to employ adequate procedures for determining competency once the issue has come to the attention of the court, whether through formal motion by one of the parties or as a result of information that becomes available in the course of criminal proceedings." **State v. Sanders,** 209 W. Va. 367, 377, 549 S.E.2d 40, 50 (2001).

Furthermore, this Court has held that "when a trial judge is made aware of a possible problem with defendant's competency, it is abuse of discretion to deny a motion for psychiatric evaluation." Syllabus Point 4, in part, **State v. Demastus**, 165 W. Va. 572, 270 S.E.2d 649 (1980).

Due to the profound importance of assuring that criminal defendants are not denied their due process rights by being subjected to trial, conviction or sentencing when they do not possess the requisite mental competence, when a trial judge orders a competency examination under **W. Va. Code § 27-6A-1(a)**, but the examination is not undertaken in the manner required by that statute, the court must grant a subsequent motion for a competency evaluation made by the defendant and order any such examinations as are necessary to comport with **§ 27-6A-1(a).**

Whenever a court of record, or in the instance of a defendant charged with public intoxication a magistrate or other judicial officer, believes that a defendant in a felony case . . . . may be incompetent to stand trial or is not criminally responsible by reason of mental illness, mental retardation or addiction, it may at any stage of the proceedings after the return of an indictment or the issuance of a warrant or summons against the defendant, order an examination of such defendant to be conducted by one or

*51*

more psychiatrists, or a psychiatrist and a psychologist, or in the instance of an individual charged with public intoxication, an alcoholism counselor:* * * *(d) Within five days after the receipt of the report on the issue of competency to stand trial, or if no observation pursuant to subsection (b) of this section has been ordered, within five days after the report on said issued following an examination under subsection (a) of this section, the court of record shall make a finding on the issue of whether the defendant is competent for trial.

**RELEVENT FACTS;**

In this particular Case, The State's theory was that the Petitioner/Defendant was a Homeless alcoholic that lived on the streets and river banks of Huntington West Virginia who went into a black fit of rage while under the influence of drugs and alcohol and attacked a complete stranger in a residence totally unknown to the Petitioner/Defendant.

As the theory aforementioned was a matter of record, The Court's Appointed Defense Counsel, Attorney John Laishley was fully aware of competency Issues, when he was informed of the extensive mental disorders and History in detail, **[EXHIBIT-MENTAL HISTORY],** Attorney Laishley stated that Judge Farrell would NOT entertain a Motion for a Psychological evaluation and that he would NOT file one, Attorney Laishley also REFUSED to investigate the Petitioners/Defendant's mental disorders and History after being informed of such as presented in **[EXHIBIT-MENTAL HISTORY],** There exists NO billing(s) for Investigation(s) into the aforementioned and matter of factly there was billing for only 3.7 hours of Investigation(s) for the entire Case and it's Defense for Trial, however the strategy, or lack of such is not the issue, at issue is the ineffective assistance of Attorney Laishley's Counsel by NOT presenting to the Court the extensive serious mental disorders and History of the Petitioner/Defendant, and also by NOT Motioning the Court for a Psychological evaluation of the Petitioner/Defendant.



54

In furtherance, Attorney Laishley REFUSED to Motion the Court for a Psychological Evaluation when the Petitioner/Defendant had attempted suicide while awaiting Trial, and in fact Attorney Laishley told the Petitioner/Defendant that if he was in the Petitioner's shoes, he would kill himself, and recommended cutting the throat as to hanging.

Had the extensive mental disorders and History of the Petitioner/Defendant been brought to the attention of the Court by Attorney Laishley, then certainly there would have been a Psychological Evaluation ordered pursuant to **W. Va. Code § 27-6A-1** to determine if the Petitioner/Defendant was competent at the time of the crime and to stand Trial.

As it is a Denial of Due process, Petitioner's rights were violated when Appointed Defense Counsel failed, during his trial, to order competency evaluation, as such should have been presented to the Court to establish the Petitioner's /Defendant's competency not only during the criminal event and during Trial, but also should have been presented at the sentencing phase as this Case was Capital and there was a determination as to Life with or without mercy.

**RELIEF SOUGHT**

Therefore the Petitioner seeks the relief of the Reversal of Conviction and Remand for a New Trial in the Cabell County Circuit Court due to the Ineffective Assistance of Counsel a violation of The Sixth Amendment to the U.S. Constitution guarantees that in all criminal prosecutions, the accused has the right to the assistance of counsel for his defense. See U.S. CONST. amend. VI.

53

**INEFFECTIVE ASSISTANCE OF COUNSEL;**

**FAILURE AND REFUSAL TO OBJECT TO STATE'S KNOWING USE OF PERJURED TESTIMONY**

The State's Prosecutor, Chris Chiles did knowingly and intentionally present False, Fabricated, Perjured testimony of a State's witness, Mr. James Marcum to the Court and it's Jurors so as to cause an intentional impact upon the Juror's decision and determination of guilt.

Prosecutor Chiles did allow and lead the testimony of James Marcum wherein he described in graphic detail that he watched his best friend being viciously beaten on the head repeatedly with a Ball Bat and that he witnessed his friends brains actually being beat out of his head, He also went into detail in explaining that he had to clean up skull fragments and Brain matter after the victim was removed from the scene and taken to the hospital, Prosecutor Chiles went even further and introduced a bat into evidence at that point and then allowed Mr. Marcum to testify and identify the bat as, "That is what beat his brains out of his head, It Is! "and "that boy beat him to death", this testimony cast a cloud over the entire Court room and had the jurors in tears, crying and sobbing uncontrollably and without a doubt had a very serious and determinative effect on the Jurors and the decision in which was returned, not only as to guilt but also as to the penalty of life without.

As this testimony was being presented and led by Prosecutor Chile's, The Petitioner's/Defendant's Appointed Lawyer REFUSED to object to the testimony being offered, In fact, Petitioner/Defendant pleaded with Attorney Laishley's assistant Greg Cook to OBJECT since this testimony was in fact impossible on it's face as ALL medical records show, However, This testimony was left unchallenged and uncorrected by Petitioner's Defense Attorney.

61

54

The fact that this testimony was known to be false, fabricated and perjured is evidenced by Attorney Laishley's presenting the very facts of the victim's never receiving or suffering ANY type of head injury at a pretrial hearing and was supported by ALL medical records and reports relating to the victim.

The fact that this testimony was not only unchallenged but allowed to be led by Defense Counsel is beyond ineffective, it was malicious and intentional and caused the Petitioner a severe prejudice and an impact on the Juror's that was irreparable as they were left in tears, crying and sobbing uncontrollably, in fact it was the Court, Judge Farrell who had to chime in and instruct Prosecutor Chiles to "Stop Leading" the witness, only after the Testimony was allowed to pass unchallenged.

**RELIEF SOUGHT;**

Therefore the Petitioner seeks the relief of the Reversal of Conviction and Remand for a New Trial in the Cabell County Circuit Court due to the Ineffective Assistance of Counsel a violation of The Sixth Amendment to the U.S. Constitution guarantees that in all criminal prosecutions, the accused has the right to the assistance of counsel for his defense. See U.S. CONST. amend. VI.



62

**State's knowing Use of Perjured Testimony;**

The State's Prosecutor, Chris Chiles did knowingly and intentionally present False, Fabricated, Perjured testimony of a State's witness, Mr. James Marcum to the Court and it's Jurors so as to cause an intentional impact upon the Juror's decision and determination of guilt.

Prosecutor Chiles did allow and lead the testimony of James Marcum wherein he described in graphic detail that he watched his best friend being viciously beaten on the head repeatedly with a Ball Bat and that he witnessed his friends brains actually being beat out of his head, He also went into detail in explaining that he had to clean up skull fragments and Brain matter after the victim was removed from the scene and taken to the hospital, Prosecutor Chiles went even further and introduced a bat into evidence at that point and then allowed Mr. Marcum to testify and identify the bat as, "That is what beat his brains out of his head, It Is! "and "that boy beat him to death", this testimony cast a cloud over the entire Court room and had the jurors in tears, crying and sobbing uncontrollably and without a doubt had a very serious and determinative effect on the Jurors and the decision in which was returned, not only as to guilt but also as to the penalty of life without.

The Prosecutor, Chris Chiles was fully aware of the facts of the Case, those being that the victim in this instance NEVER received ANY such head injury as was being described in detail to the Jury, more specifically there was NO BRAIN EXPOSURE, NO SKULL FRACTURES, as ALL of the MEDICAL evidence establishes, the victim was alert, coherent, in a minimal pain level of 2 on a 10 scale, and IN FACT the victim signed his own medical releases for surgeries, as he was NOT beat to death as was described by the State's witness James Marcum,

63                                                                                                    56

in fact the Victim had a broken leg, fingers and died more than 9 days AFTER the event, and the cause of death was a heart attack, as this is evidenced by all of the existing medical records and autopsy report in which the State's Prosecutor Chris Chiles was familiar with and yet he knowingly and willingly led and presented this prejudicial fabricated, false and perjured testimony to the Jury, and allowed such to go uncorrected intentionally.

It is a basic principle of law that prosecutors have a duty to the court not to knowingly encourage or present false testimony. It has been correctly observed that when the state obtains a conviction through the use of evidence that its representatives know to be false, the conviction violates the **Due Process Clause of the Fourteenth Amendment. U.S. Constitution. amend. XIV**. The state's knowing use of perjured testimony to obtain a criminal conviction constitutes a violation of due process of law. Although it is a violation of due process for the state to convict a defendant based on false evidence, such conviction will not be set aside unless it is shown that the false evidence had a material effect on the jury verdict.

A conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.

A conviction acquired through the knowing use of perjured testimony by the government violates due process, regardless of whether the government solicited the testimony or simply allowed it to pass uncorrected. **United States v. Kelly**, 35 F.3d 929, 933 (4th Cir. 1994) (citing **Napue v. Illinois**, 360 U.S. 264, 269, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959)). However, "[a] defendant seeking to vacate a conviction based on perjured testimony must show that the testimony was, indeed, perjured." **United States v. Griley**, 814 F.2d 967, 971 (4th Cir. 1987).

6 4



Petitioner also argues due process violations based on the knowing use of perjured testimony by the government. A conviction acquired through the knowing use of perjured testimony by the government violates due process. **United States v. Kelly**, 35 F.3d 929, 933 (4th Cir. 1994)(citing **Napue v. Illinois,** 360 U.S. 264, 269, 79 S. Ct. 1173, 1177, 3 L. Ed. 2d 1217 (1959)). This is true whether the government solicited testimony it knew or should have known to be false or simply allowed such testimony to pass uncorrected. Id. (citing **United States v. Agurs**, 427 U.S. 97, 103, 96 S. Ct. 2392, 2397, 49 L. Ed. 2d 342 (1976)). The Court has consistently set aside convictions obtained by the knowing use of false testimony when there was "any reasonable likelihood that the false testimony could have affected the judgment of the jury." **United States v. Agurs**, 427 U.S. 97, 106, 96 S. Ct. at 2399. Courts hold that even when false testimony bears only on the credibility of government witnesses and other evidence has called the witnesses' credibility into question, a conviction must be reversed when "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." Agurs, 427 U.S. at 103, 96 S. Ct. at 2397. The courts have predicated that conclusion on the fact that "the jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." Napue, 360 U.S. at 269, 79 S. Ct. at 1177. The knowing use of perjured testimony would force the government to demonstrate that the use of such testimony was "harmless beyond a reasonable doubt." Bagley, 473 U.S. at 679 n.9.



65

**CONCLUSION;**

In order to succeed on a claim that the prosecutor presented false testimony at trial, a defendant must demonstrate **(1)** that the prosecutor presented false testimony; **(2)** that the prosecutor knew or should have known it was false; and **(3)** that there is a reasonable likelihood that the perjured testimony could have affected the verdict.

Therefore the Petitioner offers as **(1)** Prosecutor Chris Chiles did present the False Testimony of James Marcum that described in graphic detail events and injuries that were physically impossible as the medical records clearly prove; **(2)** Prosecutor Chris Chiles knew such testimony was false, fabricated and perjured as he was aware that events and injuries described by the witness were physically impossible as the medical records clearly prove which were in Prosecutor Chiles possession; and **(3)** There is no doubt that the aforementioned testimony of James Marcum that went uncorrected and offered as fact had an effect on the Juror's and the verdict, as they were left in tears, crying and sobbing uncontrollably, and creating a hostility felt throughout the Court, Without question this testimony had a direct impact on the Juror's verdict and also an impact as to the sentence they passed that determined a Life Without finding.

**RELIEF SOUGHT;**

A conviction acquired through the knowing use of perjured testimony by the government violates due process Clause of Fifth Amendment rights by presenting perjured testimony at trial and should therefore be REVERSED and REMANDED for a new Trial in Cabell County West Virginia Circuit Court.

66

**State's failure to present competent evidence to the jury;**

**Intentionally Presenting testimony incredible as a matter of law**

The State's Prosecutor, Chris Chiles did knowingly and intentionally present False, Fabricated, Perjured testimony of a State's witness, Mr. James Marcum to the Court and it's Jurors so as to cause an intentional impact upon the Juror's decision and determination of guilt.

Prosecutor Chiles did allow and lead the testimony of James Marcum wherein he described in graphic detail that he watched his best friend being viciously beaten on the head repeatedly with a Ball Bat and that he witnessed his friends brains actually being beat out of his head, He also went into detail in explaining that he had to clean up skull fragments and Brain matter after the victim was removed from the scene and taken to the hospital, Prosecutor Chiles went even further and introduced a bat into evidence at that point and then allowed Mr. Marcum to testify and identify the bat as, "That is what beat his brains out of his head, It Is! "and "that boy beat him to death", this testimony cast a cloud over the entire Court room and had the jurors in tears, crying and sobbing uncontrollably and without a doubt had a very serious and determinative effect on the Jurors and the decision in which was returned, not only as to guilt but also as to the penalty of life without.

As the testimony presented was impossible and "unbelievable on its face," in that it contained "facts that [the witness] physically could not have possibly observed or events that could not have occurred under the laws of nature, as evidenced by ALL medical reports, Autopsy Reports, Police Reports, Paramedic Reports and Fire Department Reports, there was no such injuries inflicted upon the Victim, NOR was there the exposure of Brain matter or skull fragments, there also was no cleaning up of brain matter and skull fragments, as this is IMPOSSIBLE since the victim had never suffered such injuries and the testimony of such left uncorrected by the court knowing that such was impossible was not only prejudicial but borderline Judicial misconduct as it is held that;



When testimony is so unbelievable on its face that it defies physical laws should the court intervene and declare it incredible as a matter of law. **U.S. v. Lerma**, 657 F.2d 786, 789 (5th Cir. 1981) (Unit A) (citing cases). 22 **Accord U.S. v. Mack**, 695 F.2d 820 (5th Cir. 1983); **U.S. v. Narciso**, 446 F. Supp. 252, 282-83 (E.D. Mich. 1977).

To find testimony incredible as a matter of law, it must "relate to facts that the witness[es] could not possibly have observed or to events which could not have occurred under the laws of nature." **United States v. De La Rosa**, 171 F.3d 215, 221 (5th Cir. 1999) (citation and quotation marks omitted). "Laws of nature" refers to facts or events that are impossible in a physical sense; not merely unlikely due to human nature. See **United States v. Lindell**, 881 F.2d 1313, 1322 (5th Cir. 1989) ("Only when testimony is so unbelievable on its face that it defies physical laws should the court intervene and declare it incredible as a matter of law.") (citation omitted); see also United States v. Shaw, 338 F. App'x 404, 408 (5th Cir. 2009) (holding that defendant "appears to confuse 'the laws of nature' with 'human nature'").

A fact finder is not entitled to credit testimony that is "incredible as a matter of law." **United States v. Rivera**, 775 F.2d 1559, 1561 (11th Cir. 1985). This exception, however, is "stringent" and is satisfied only when the testimony is "unbelievable on its face," in that it contains "facts that [the witness] physically could not have possibly observed or events that could not have occurred under the laws of nature." Id. (quoting **United States v. Cravero**, 530 F.2d 666, 670 (5th Cir. 1976) (alterations in original); see also **United States v. Williams**, 49 Fed. Appx. 420, 424 (4th Cir. 2002). In other words, to be "incredible as a matter of law," the testimony must be more than merely implausible; it must be impossible, and if it is "incredible as a matter of law," an agency cannot rely on it in denying a claim. **Donahue v. Barnhart**, 279 F.3d 441, 446 (7th Cir. 2002)

68



The doctrine of inherent unbelievability arguably can be reconciled with the constitutional rights discussed above by interpreting them as limited to the right to present competent evidence to the jury. While this definitional move seemingly solves all, it misses the point. The important point is that the court must define "competent evidence" broadly so as to afford the defendant his constitutional rights and to preserve the historic role of the criminal jury in deciding matters of credibility.

The constitutional considerations discussed above -- the reasonable doubt requirement and implementing rules, the defendant's right to testify on his own behalf, and his right to a jury trial -- combine to cast serious doubt on the Court's authority to rule the testimony of a defendant or other defense witnesses unbelievable as a matter of law. Indeed, the court has been unable to find a single case where a court has so ruled.

Even as applied against government witnesses, the doctrine of inherent unbelievability has been narrowly construed in criminal cases.

Only when testimony is so unbelievable on its face that it defies physical laws should the court intervene and declare it incredible as a matter of law. **U.S. v. Lerma**, 657 F.2d 786, 789 (5th Cir. 1981) (Unit A) (citing cases). 22 Accord **U.S. v. Mack**, 695 F.2d 820 (5th Cir. 1983); **U.S. v. Narciso**, 446 F. Supp. 252, 282-83 (E.D. Mich. 1977).

## CONCLUSION;

The fact that this testimony was not only unchallenged but allowed to be led by the Court's not applying The doctrine of inherent unbelievability while being aware of the medical facts and impossibility of the victim ever receiving the injuries which were fraudulently detailed and intentionally presented by perjured testimony violates due process Clause of the Fourteenth Amendment. U.S. Constitution and establishes Judicial Misconduct and an abuse of discretion by such.



**RELIEF SOUGHT;**

Therefore the Petitioner seeks the relief of the Reversal of Conviction and Remand for a New Trial in the Cabell County Circuit Court due to the Court's abuse of discretion, Judicial misconduct, The Court's failure to apply doctrine of inherent unbelievability and a violation of The Sixth Amendment to the U.S. Constitution.

63

70

**Prosecutorial misconduct;**

**Denial of fundamental fairness by the State's knowing use of false evidence at trial**

The prosecutor, Chris Chiles committed prosecutorial misconduct by knowingly and intentionally presenting False, Fabricated, Perjured testimony of a State's witness, Mr. James Marcum to the Court and it's Jurors so as to cause an intentional impact upon the Juror's decision and determination of guilt.

By presenting such perjured testimony State's Prosecutor Chris Chiles intentionally engaged in prosecutorial misconduct when it "knowingly and intentionally used . . . perjured testimony in order to impact the juror's and cause hostility towards the Petitioner/Defendant so as to obtain a conviction.

The specific perjured testimony of a State's witness Mr. James Marcum was presented in bad faith and knowingly that such was false, fraudulent, fabricated and perjured to the Court and it's Jurors so as to cause an intentional impact upon the Juror's decision and determination of guilt.

Prosecutor Chiles did allow and lead the testimony of James Marcum wherein he described in graphic detail that he watched his best friend being viciously beaten on the head repeatedly with a Ball Bat and that he witnessed his friends brains actually being beat out of his head, He also went into detail in explaining that he had to clean up skull fragments and Brain matter after the victim was removed from the scene and taken to the hospital, Prosecutor Chiles went even further and introduced a bat into evidence at that point and then allowed Mr. Marcum to testify and identify the bat as, "That is what beat his brains out of his head, It Is! "and "that boy beat him to death", this testimony cast a cloud over the entire Court room and had the jurors in tears, crying and sobbing uncontrollably and without a doubt had a very serious and determinative effect on the Jurors and the decision in which was returned, not only as to guilt but also as to the penalty of life without.



71

Through the prosecutorial misconduct of Chris Chiles presenting perjured testimony intentionally, there is a blatant violation of the Fundamental Fairness clause and the Petitioner was in fact denied the right of Due process through Prosecutor Chile's misconduct standing in violation of the Petitioner's 14th Amendment of the United States Constitutional right of Due Process.

This misconduct is not only of Constitutional context, but stands within the realm of Criminal by it's intentionally being presented and allowed to pass uncorrected in order to Convict a person for a Capital Offense.

### RELIEF SOUGHT

Petitioner seeks the relief of a Vacation of his Conviction(s) the Reversal of Sentence and the Remand for a New trial in the Cabell County Circuit Court, Petitioner seeks these Reliefs for the violations of his 14th and 6th Amendment Rights of Due Process as are garunteed by the United States Constitution.

72



**Double Jeopardy;**

Petitioner herein was indicted for BOTH 1st Degree Murder and Burglary, the State's theory of the Case was that during the commission of a Burglary, Specifically, an Entering without breaking into the victim's home, during this event the Petitioner/Defendant was supposedly in a severe intoxicated state, went into a fit a black rage and then did intentionally kill the Victim, however as the presentment of a Felony Murder theory was pursued, at Trial's end the State deviated from said theory and failed to properly instruct the Jury as to the two categories of Murder, willful, deliberate, and premeditated killing and felony-murder—if under the facts of the particular case, the jury can find the defendant guilty of either category of first-degree murder.

Double jeopardy prohibits an accused charged with felony murder, as defined by **W. Va. Code § 61-2-1**, from being separately tried or punished for both murder and the underlying enumerated felony.

Double jeopardy prohibits an accused charged with felony murder, as defined by **W. Va. Code § 61-2-1** from being separately tried or punished for both murder and the underlying enumerated felony." Syllabus point 8, **State v. Williams**, [172] W. Va. [295], 305 S.E.2d 251 (1983).Syl. pt. 8, **State v. Giles**, 183 W. Va. 237, 395 S.E.2d 481 (1990).

The double jeopardy clauses of the federal and state constitutions protect an accused in a criminal proceeding from multiple prosecutions and multiple punishments for the same offense. This protection is held to prohibit serial prosecutions and the imposition of separate punishments for both a greater and a lesser included offense arising out of a single criminal act or transaction.



73

Robbery is a lesser included offense of felony-murder if a conviction for the greater offense (felony-murder) could not be had without conviction for the lesser crime (robbery). If the defendant is convicted of and sentenced to imprisonment for both murder and robbery, his sentence would violate the double jeopardy prohibition against multiple punishments.

The determination of whether a person is being tried for or has been convicted of both a greater and a lesser included offense does not necessarily turn on whether he is charged with violating more than one criminal statute. Since many statutory crimes are duplicative, separate statutory crimes may be the "same offense" under the double jeopardy clause, even though they are not identical in either constituent elements or actual proof. In the absence of any expression of legislative intent on the issue, the test of whether violations of separate statutory provisions arising out of one criminal episode constitute the "same offense" for double jeopardy purposes is the "same evidence" test. Where the same act or transaction constitutes a violation of two distinct provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of a fact which the other does not.

The crime of felony-murder is a distinct category of first-degree murder, which is defined as murder in the commission of, or attempt to commit, arson, rape, robbery or burglary.

**W. Va. Code § 61-2-1**. To sustain a conviction of felony-murder, proof of the elements of malice, premeditation or specific intent to kill is not required. Rather, the elements which the State is required to prove to obtain a conviction of felony murder are: (1) the commission of, or attempt to commit, one or more of the enumerated felonies; (2) the defendant's participation in such commission or attempt; and (3) the death of the victim as a result of injuries received during the course of such commission or attempt.

74



In a prosecution for first-degree murder, the State must submit jury instructions that distinguish between the two categories of first-degree murder—willful, deliberate, and premeditated killing and felony-murder—if, under the facts of the particular case, the jury can find the defendant guilty of either category of first-degree murder.

When the State also proceeds against the defendant on the underlying felony, the verdict forms provided to the jury should also reflect the foregoing distinction so that, if a guilty verdict is returned, the theory of the case upon which the jury relied will be apparent. **State v. Giles**, 183 W. Va. 237, 395 S.E.2d 481, 1990 W. Va. LEXIS 90 (W. Va. 1990); **State v. Walker**, 188 W. Va. 661, 425 S.E.2d 616, 1992 W. Va. LEXIS 269 (W. Va. 1992); **State v. Hottle**, 197 W. Va. 529, 476 S.E.2d 200, 1996 W. Va. LEXIS 144 (W. Va. 1996).

In the Petitioner's Case the distinction between the two categories of first-degree murder— willful, deliberate, and premeditated killing and felony-murder was NOT reflected in the verdict forms as according to the Citations aforementioned so to establish the theory of the case upon which the jury relied, and in furtherance the Court allowed an untimely and after set deadline on the last day of Trial in violation of W.Va. Trial Court Rule 42.02 Presentation of Jury Instructions;

    1) Each Counsel shall prepare jury instructions, indicating citations and authorities, and present them to the presiding Judicial officer and serve them on opposing Counsel NOT LESS than three (3) business days before the day set for trial.

The Instructions submitted were called the "Jenkins Charge" and were relevant to a Felony murder case, **State V. Jenkins** 229 W. Va. 415; 729 SE2d 250729 S.E.2d 250; 2012 Holding that;

25



It is well settled that the consequences of an act which is the efficient cause of the death of another are not excused, nor is the criminal responsibility for causing death lessened, by the pre-existing physical condition of the person killed which rendered him or her unable to withstand the shock of the wound inflicted, and without which predisposed condition the blow would not have been fatal. It is immaterial that the accused did not know that the deceased was in a feeble condition which facilitated the killing. Responsibility for homicide attaches to one who accelerates the death of a person in poor physical condition. It is also clear that foreseeability is not an element in the corpus delicti. The required causation is not the type of causation involved in tort liability. It is not necessary that the defendant could have reasonably anticipated that his or her act would cause death.

**CONCLUSION;**

Double jeopardy prohibits an accused charged with felony-murder, as defined by W. Va. Code § 61-2-1, from being separately tried or punished for both murder and the underlying enumerated felony, and in the record shows that in this case the Petitioner was in fact charged and convicted during Trial of BOTH, 1st degree murder and the underlying felony of Burglary, constituting a Double Jeopardy violation of The Double Jeopardy Clause in Article III, Section 5 of the West Virginia Constitution and Article III, § 5 of the United States Constitution.

**RELIEF SOUGHT;**

Petitioner seeks the Reversal of Conviction(s) for 1st Degree Murder and Burglary and the Remand back to the Cabell County Circuit Court for New Trial for the violation(s) of the afore cited Constitutional Amendments; The Double Jeopardy Clause in Article III, Section 5 of the West Virginia Constitution and Article III, § 5 of the United States Constitution.

26

69

EXHIBITS AS FOLLOWS;

EXHIBIT-FLASH

EXHIBIT-FLASH NEVER EXPLAINED THE LAW

EXHIBIT-MENTAL HISTORY

EXHIBIT-MANDAMUS

EXHIBIT-AFFIDAVIT

78

70

EXHIBIT "FLASH"

Testimony of John "jack" Laishley

43

11

EXHIBIT- FLASH, MARKED, DESIGNATED AND ENTERED

1   MR. LAISHLEY:   And then lastly, Judge, as I

2   have set forth, it was the, and if it's all right for

3   me to call it the Jenkins charge, the tardy jury

4   instruction that the Court allowed to be inserted into

5   its charge to the jury offered at the last moment or as

6   nearly at the last moment, as I recall.  Without the

7   benefit of the transcript it may have been after some

8   of the charge to the jury.  In any event, it was

9   contemporaneous with the charge to the jury, and it was

10  contrary, it was offered contrary to the Court's

11  standing instructions.  And it's our position that

12  that, well, I think I said in my motion is that the

13  force of the Jenkins charge cannot be overstated, and I

14  would add to that the force and effect of that charge

15  cannot be overstated.

16       I did not have the opportunity to and I don't

17  believe it is my responsibility as his defense counsel

18  to offer charges that would be detrimental to his case,

19  and certainly the Jenkins charge is one of those that

20  would be detrimental.  I have since been provided with

21  a copy of that case.  I have read the case, I have

22  studied it, I have studied its predecessor, the Durham

23  case, and if that had been offered, presented to me the

24  week before trial as required by Your Honor, then

(44)

1   certainly I would have counseled Mr. Dreyfuse
2   accordingly, and it may have made a difference in not
3   only his strategy but also in his desire to take the
4   state's offer.  It's very -- Judge, I cannot overstate
5   the force of that Jenkins charge and the effect that it
6   had on, I'm sure the effect that it had on the jury.
7   And also Mr. Chiles was able to very very effectively
8   argue that in his closing and was able to mold his
9   examination of his witnesses, his medical experts as
10  well as his cross-examination of our expert around the
11  facts of the Jenkins case and the instruction that it
12  produced.
13          MR. CHILES:  Could I make one thing clear on
14  that point, Your Honor?
15          THE COURT:  Sure.
16          MR. CHILES:  I don't think Mr. Laishley is
17  suggesting, but I don't want it to be unclear on the
18  record, it's not that we had this case and had that
19  instruction prepared all along and just sat on it and
20  offered it at the minute.  We did not actually find
21  that case doing research until the night before it was
22  given to Mr. Laishley, and we realized the significance
23  of it only after having heard the testimony of both
24  Dr. Denning and the defense expert, and then in


(45)

1  researching we found that case and I notified
2  Mr. Laishley of it the night before, summarized it,
3  presented him with both a proposed jury instruction and
4  a copy of the case before trial began that following
5  Wednesday morning.

6          THE COURT:  Just so the record is clear, I
7  think, Mr. Laishley, in the Jenkins case you are
8  believing that the instructions that said the
9  reasonable and expected outcome of the injuries
10 suffered, that the preexisting condition does not I
11 will say mitigate or excuse the results of the beating
12 that was administered.

13         MR. LAISHLEY:  I think it's even stronger
14 than that, Judge, but, yes.  I agree, I want to say I
15 agree that Jenkins is good law.  I have studied
16 Jenkins, I have studied its predecessor Durham, and I
17 have studied the instruction that was offered in both
18 of those cases and compared it to the instruction that
19 the state offered, and I couldn't find any error, I
20 couldn't punch a hole in it anywhere, Judge, and I
21 consider it to be, yeah, it was detrimental.

22         THE COURT:  And you did offer Dr. Touchon?
23         MR. LAISHLEY:  Touchon, yes.
24         THE COURT:  Dr. Touchon in your case and

82



1   chief, you brought in a cardiologist for the purpose of

2   influencing the jury to believe that this man died of a

3   cardiac event rather than die of having been beat with

4   a baseball bat; is that correct?

5           MR. LAISHLEY:  Yes.  But the Jenkins

6   instruction obliviates that argument, Judge.

7           THE COURT:  I think that's what Mr. Chiles'

8   point is is after you raised that defense and that you

9   brought Dr. Touchon in, and I had my court reporter

10  type up that segment last week, I don't find the

11  transcript right now, but --

12          THE CLERK:  Do you want me to get it?

13          THE COURT:  Yes, go look on my desk.

14          It was discussed that before the jury was

15  charged you objected.  You felt that the state had not,

16  as you say in your motion, complied with my, I guess

17  it's my administrative order.  I'm not sure it's

18  actually an order, but we try to get the instructions

19  and the voir dire the week before, which is just trying

20  to manage the trial.  But I don't think it was that

21  prejudicial.  I think it was an appropriate instruction

22  to give in light of the evidence, particularly when you

23  called your own medical expert to refute the state's

24  case as to the cause of death, and I will find that it



1   was appropriate to give and it was timely disclosed,

2   and I will overrule your objection on that basis,

3   reconsideration.

4            MR. LAISHLEY:  If I might, Your Honor, the

5   instruction was not offered after Dr. Touchon

6   testified.  My recollection was that -- by the way, the

7   state had a summary of what Dr. Touchon was going to

8   testify to, and I'm sure Mr. Chiles reviewed that with

9   his medical experts prior to trial, but that

10  instruction came early in the morning just as you were

11  about to take the bench and the trial proceeded.  I

12  mean, it just got put in there and on we go, on we

13  went.  And my point is if that had been -- and

14  Mr. Chiles did know what we were going to testify to, I

15  mean, that was disclosed.

16           THE COURT:  And that's to be expected in a

17  trial, as the rules require if you're going to call an

18  expert they have to do a report.  You have to remember

19  Dr. Touchon's really wasn't a report, it was a letter

20  that we let you substitute that and that would have

21  given Mr. Chiles some notice as the anticipated

22  testimony.

23           You're right, the morning that the case went

24  to trial we did instructions I guess the evening



1    before, and I'm just looking at the transcript here
2    where first thing I say is you have heard all the
3    evidence, I'm going to ask you to retire to your jury
4    room so we can consider some other matters, and then we
5    brought out the copies of the instructions, you renewed
6    your Rule 29 motion, we changed the instruction to
7    reflect that Mr. Dreyfuse had testified.  As is my
8    custom, I think we went over every page asking what the
9    objections were, if any.

10         There's a long discussion about what unlawful
11   assault, maim, disfigure, I remember we had discussion
12   about that.  You gave the unlawful wounding.  That's
13   where we had the discussion about following the
14   statutory language there.  And then we had a discussion
15   about, apparently on page 19 of the instructions, that
16   they may infer a person intends the natural and
17   probable consequences of their actions, and that comes
18   down to the Jenkins instruction that the Court
19   instructs the jury that to be guilty of murder it's not
20   necessary that the wounds be the direct cause.  The
21   state provided the case law for that.  And you say that
22   was just provided to you this morning.

23         You suggested better language than the
24   Jenkins language, and I asked if you had anything to



1   offer.  You cite the State v Durham case, you said you

2   haven't pulled it but the ~~register~~ report discusses it.  On note

3   5 I think of the Durham case, the defendant's criminal

4   response for homicide where he inflicts a wound

5   resulting in death, but because the death is related to

6   the proper treatment of the wound such treatment or

7   effect of preexisting physical disability.  I say I

8   think Dr. Touchon simply said he had a heart attack and

9   died but did not disagree with the fact that that

10  surgery was a significant event.

11          I'm going to deny your motion, Mr. Laishley.

12  I think the law was correctly stated.  I think it was

13  an instruction that needed to be given, especially in

14  light of Dr. Touchon's attempt to minimize the

15  condition or minimizing the cause and that it was

16  appropriately appropriate for the Court to give that

17  instruction.  So I will deny your motion and note your

18  objection.

19          Anything else, sir?

20          MR. LAISHLEY:  Just that everything you said

21  states my case, is that if we would have known that

22  that was coming in like that that he could have, should

23  have been counseled accordingly and that it could have

24  made a difference, a substantial difference in his

2.  **Rule 42.02 of the West Virginia Trial Court Rules (T.C.R.) (1999) (Presentation of Jury Instructions) states:**

Each counsel shall prepare jury instructions, indicating citations and authorities, and if the court directs, verdict forms and special interrogatories, and present them to the presiding judicial officer and serve them on opposing counsel not less than three (3) business days before the day set for trial or at such other times as the presiding judicial officer may order.

See also *W.Va. Code*, 56-6-19 (1923) (Instructions to jury generally; form and manner of giving); *W.Va. Code*, 56-6-20 (1923) (Reading instructions to jury; instructions part of record); *W.Va. Code*, 56-6-21 (1923) (Time for examining instructions; objecting thereto and settlement there of; and *W.Va. Code*, 56-6-22 (1923) (Oral instructions by court; written instructions during trial).

## 1.03 GENERAL DISCUSSION OF JURY INSTRUCTIONS

See F. Cleckley, <u>Handbook on West Virginia Criminal Procedure</u>, Vol. 2, Chapter XVIII, Instructions to the Jury (2d Ed. 1993) in which the following topics are discussed:

A. Definition of "Instructions"

B. Requirement for Instructions

C. Responsibility to Instruct

D. Purpose of Instructions

E. Standard of Review of Instructions on Appeal

F. Tailoring Instructions

G. Defendant's Theory of the Case and Other Problem-Causing Instructions

H. Judge's Comment on Evidence

I. When Instructions Given

87

EXHIBIT-FLASH NEVER EXPLAINED THE LAW

EXHIBIT "FLASH NEVER EXPLAINED THE LAW"



As evidenced by the following attatched Cases that were sent to John "JACK" Laishley, The Petitioner's Defense Counsel, on the top of the Case page, it is obvious that the Cases were not recieved until October 22, 2013, at 8:18 PM, which was 4 Days AFTER the END of the Trial, The Case(s) are of the "Jenkins" Charge that Laishley was totaly unaware of, and that were a standard set in well established Black Letter Law.

This was not made aware to the defendant until 4 days AFTER the TRIAL's END and the Defendant's being found guilty, which was totally the opposite of what was explained to Him prior to Trial.

Furthermore, as evidenced by **PAGE 10** of the Jenkins Case, at the last paragraph there exists the markings that PROVE Attorney Laishley was still in question of the "Jenkins" law being in existance in THIS STATE as can be deduced by the markings made on this page.

If this LAW would have been known to John Laishley, and had He informed the defendant of such a Law, then surely the defendant would have accepted a plea of 30 years rather than face a CERTAIN life wiithout, for a conviction that was guranteed by the LAW that a Defendant IS criminally responsible where he inflicts wounds resulting in death, even though the death is related to the proper teatment or the effect of a pre existing physical disability, as is the case since the Victim died from a Heart attack during a surgery 9 days after an attack, This is an OBVIOUS mistake in Law and the WRONG advice by such from defense Counsel.

89

*SEE PAGES 3 THRU*
*PAGE – 10!!!!*

| | |
|---|---|
| **From:** | |
| **Sent:** | noreply@fastcase.com |
| **To:** | Tuesday, October 22, 2013 8:18 PM — *GUILTY OCT 18 – 4 DAYS!* |
| **Subject:** | jlaishley@frontier.com |
| | Fastcase Document - State v. Jenkins |

*(This document has been sent to you from Fastcase by John Laishley)*

**229 W.Va. 415**
**729 S.E.2d 250**

**STATE of West Virginia, Respondent**
**v.**
**Henry C. JENKINS, Petitioner.**

**No. 11–0362.**

**Supreme Court of Appeals of**
**West Virginia.**

**Submitted March 27, 2012.**
**Decided June 21, 2012.**

**Summaries:**

**Source: Justia**

In this appeal, Defendant challenged an order of the circuit court convicting him of felony murder and child neglect resulting in death and sentencing him to life with mercy for the felony-murder conviction and a consecutive sentence of three to fifteen years for child neglect resulting in death. The Supreme Court affirmed, holding (1) the circuit court did not err in allowing the State to proceed against Defendant for the separate offenses of felony murder, death of a child by a parent, and child neglect resulting in death; (2) the evidence was sufficient to prove Defendant caused his son's death beyond a reasonable doubt; (3) the circuit court did not err in suppressing Defendant's statement only during the State's case-in-chief; (4) the circuit court did not err in allowing the State to use photographs of the child's autopsy; and (5) the circuit court did not err in permitting the use of certain W. Va. R. Evid. 404(b) evidence at trial.

[729 S.E.2d 254]

*Syllabus by the Court*

1. "A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might



have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. To the extent that our prior cases are inconsistent, they are expressly overruled." Syllabus Point 3, _State v. Guthrie, 194 W.Va. 657, 461 S.E.2d 163 (1995)._

2. "The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt." Syllabus Point 1, _State v. Guthrie, 194 W.Va. 657, 461 S.E.2d 163 (1995)._

3. " 'The action of a trial court in admitting or excluding evidence in the exercise of its discretion will not be disturbed by the appellate court unless it appears that such action amounts to an abuse of discretion.' Syl. pt. 5, _Casto v. Martin_ [159 W.Va. 761], _230 S.E.2d 722 (W.Va.1976)_ citing Syl. pt. 10, _State v. Huffman, 141 W.Va. 55, 87 S.E.2d 541 (1955)._' Syllabus Point 2, _State v. Rector,_ [167] W.Va. [748], _280 S.E.2d 597 (1981)._'

[729 S.E.2d 255]

Syl. pt. 3, _State v. Oldaker,_ [172] W.Va. [258], _304 S.E.2d 843 (1983)._" Syllabus Point 6, _State v. Kopa, 173 W.Va. 43, 311 S.E.2d 412 (1983)._

4. " 'Double jeopardy prohibits an accused charged with felony murder, as defined by W. Va.Code § 61–2–1 (1977 Replacement Vol.) from being separately tried or punished for both murder and the underlying enumerated felony.' Syllabus Point 8, _State v. Williams, 172 W.Va. 295, 305 S.E.2d 251 (1983)._" Syllabus Point 8, _State v. Giles, 183 W.Va. 237, 395 S.E.2d 481 (1990)._

5. "The granting of a motion to force the State to elect rests within the discretion of the trial court, and such a decision will not be reversed unless there is a clear abuse of discretion." Syllabus Point 3, _State v. Walker, 188 W.Va. 661, 425 S.E.2d 616 (1992)._

6. "The Double Jeopardy Clause in Article III, Section 5 of the West Virginia Constitution, provides immunity from further prosecution where a court having jurisdiction has acquitted the accused. It protects against a second prosecution for the same offense after conviction. It also prohibits multiple punishments for the same offense." Syllabus Point 1, _Conner v. Griffith, 160 W.Va. 680, 238 S.E.2d 529 (1977)._

7. "Under our decisions, the corpus delicti consists in cases of felonious homicide, of two fundamental facts: (1) the death; and (2) the existence of criminal agency as a cause thereof. The former must be proved either by direct testimony or by presumptive evidence of the strongest kind, but the latter may be established by circumstantial evidence or by presumptive reasoning upon the facts and circumstances of the case." Syllabus Point 6, _State v. Beale, 104 W.Va. 617, 141 S.E. 7, 141 S.E. 401 (1927)._

8. "The felony-murder statute applies where the initial felony and the homicide are parts of one continuous transaction, and are closely related in point of time, place, and causal connection, as where the killing is done in flight from the scene of the crime to prevent detection or promote escape." Syllabus Point 2, _State v. Wayne, 169 W.Va. 785, 289 S.E.2d 480 (1982)._

9. " 'The elements which the State is required to prove to obtain a conviction of felony murder are: (1) the commission of, or attempt to commit, one or more of the enumerated felonies; (2) the defendant's participation

2

in such commission or attempt; and (3) the death of the victim as a result of injuries received during the course of such commission or attempt.' *State v. Williams,* 172 W.Va. 295, [311,] 305 S.E.2d 251, 267 (1983)." Syllabus Point 5, *State v. Mayle,* 178 W.Va. 26, 357 S.E.2d 219 (1987).

10. "In order to sustain a conviction for felonious homicide, the corpus delicti is properly proved by sufficient evidence showing that the initial wound caused the death indirectly through a chain of natural causes." Syllabus Point 2, *State v. Durham,* 156 W.Va. 509, 195 S.E.2d 144 (1973).

(11) "A defendant may be held criminally responsible where he inflicts upon another a wound resulting in death, even though the cause of death is related to the proper treatment of the wound or related to such treatment or effect of a pre-existing physical disability of the victim." Syllabus Point 3, *State v. Durham,* 156 W.Va. 509, 195 S.E.2d 144 (1973).

12. "Pursuant to W. Va.Code § 61–2–1 (1991), death resulting from an overdose of a controlled substance as defined in W. Va.Code § 60A–4–401 *et seq.* and occurring in the commission of or attempt to commit a felony offense of manufacturing or delivering such controlled substance, subjects the manufacturer or deliverer of the controlled substance to the felony murder rule." Syllabus Point 3, *State v. Rodoussakis,* 204 W.Va. 58, 511 S.E.2d 469 (1998).

13. "It is a well-established rule of appellate review in this state that a trial court has wide discretion in regard to the admissibility of confessions and ordinarily this discretion will not be disturbed on review." *Syllabus Point 2, State v. Vance,* 162 W.Va. 467, 250 S.E.2d 146 (1978).

14. "A trial court's decision regarding the voluntariness of a confession will not be disturbed unless it is plainly wrong or clearly against the weight of the evidence." Syllabus Point 3, *State v. Vance,* 162 W.Va. 467, 250 S.E.2d 146 (1978).

[729 S.E.2d 256]

15. "Where a person who has been accused of committing a crime makes a voluntary statement that is inadmissible as evidence in the State's case in chief because the statement was made after the accused had requested a lawyer, the statement may be admissible solely for impeachment purposes when the accused takes the stand at his trial and offers testimony contradicting the prior voluntary statement knowing that such prior voluntary statement is inadmissible as evidence in the State's case in chief." Syllabus Point 4, *State v. Goodmon,* 170 W.Va. 123, 290 S.E.2d 260 (1981).

16. "A confession that has been found to be involuntary in the sense that it was not the product of the freewill of the defendant cannot be used by the State for any purpose at trial." Syllabus Point 2, *State v. Goff,* 169 W.Va. 778, 289 S.E.2d 473 (1982).

E. Scott Stanton, Esq., Deputy Chief Public Defender, Fayette County Public Defender's Office, Fayetteville, WV, for Petitioner.

Brian D. Parsons, Esq., Fayette County Assistant Prosecuting Attorney, Fayetteville, WV, for Respondent.

## PER CURIAM:

In this appeal, Henry C. Jenkins, defendant below (hereinafter "Petitioner"), challenges a June 28, 2010, order of the Circuit Court of Fayette County convicting him of "felony murder" and "child neglect resulting in

death," and sentencing him to life with mercy for the felony-murder conviction, and a consecutive sentence of three to fifteen years for "child neglect resulting in death." Herein, Petitioner alleges the following assignments of error: 1) that the circuit court erred in allowing the State to proceed against him for the separate offenses of felony murder, "death of a child by a parent," and "child neglect resulting in death;" 2) that the evidence was insufficient to prove that Petitioner caused his son's death beyond a reasonable doubt; 3) that the circuit court erred in suppressing Petitioner's statement only during the State's case in chief; 4) that the circuit court erred in allowing the State to use immaterial and gruesome photographs of the child's autopsy; and 5) that the circuit court erred in permitting the use of certain 404(b) evidence at trial. After thorough review of the petition for appeal, all matters of record and the briefs and argument of counsel, we find no error. We therefore affirm Petitioner's conviction.

# I.
## FACTUAL AND PROCEDURAL HISTORY

On November 19, 2008, Petitioner's fourteen-year-old son, C.C.J.[1], died at Women and Children's Hospital in Charleston, West Virginia. C.C.J., who suffered from cystic fibrosis, was later determined by autopsy to have two non-prescribed controlled substances, oxycodone and valium, in his blood stream. At the time of his death, C.C.J. resided with his father, Petitioner, in a mobile home in Fayette County, West Virginia. The child's mother, Naomi Griffith, was incarcerated at the time of C.C.J.'s death. Both of C.C.J.'s parents had been frequent abusers of pain prescription medications throughout his life. According to the record, C.C.J. had a life-long struggle with cystic fibrosis and had been in and out of hospitals many times during his childhood combating complications with his illness.

On the evening of November 13, 2008, several persons gathered at Petitioner's home. According to the evidence presented at trial, Holly Burdette arrived at the home around 10:00 p.m. after receiving a phone call from C.C.J. asking for a ride. Burdette was drinking with Marshall Walker and Shaun Stark and asked them to transport C.C.J. and Petitioner. They drove to the home of Josh Settle, a local drug dealer, where Petitioner traded Mr. Settle a bag of C.C.J.'s Jeff Gordon memorabilia collection for three oxycodone '30' pills. After the exchange, C.C.J. went into Settle's house to see a knife. C.C.J. was alone with Settle during this time. Settle denied giving C.C.J. any drugs.

[729 S.E.2d 257]

Burdette testified at trial that, of the three oxycodone pills that Petitioner obtained from Settle, she only saw two. Petitioner gave her one of the pills, whereupon she and Stark went to a neighbor's trailer. After visiting with neighbors, Burdette and Stark returned to the Jenkins home. Upon their return, Burdette found C.C.J. on the front porch vomiting. She testified that she, Petitioner, and C.C.J. then stayed up for a few more hours. C.C.J. and Petitioner eventually fell asleep on the couch, while Burdette slept on the floor with Stark.

Burdette testified that she woke C.C.J. up around 5:00 a.m. and asked him if he was feeling better. She testified that C.C.J. responded that he did. She then drifted off to sleep and woke approximately two hours later. When she awoke around 7:00 a.m., Petitioner was already awake sitting up in a chair smoking a cigarette. She heard what she described as a gargling noise and determined it was coming from C.C.J. Stark began performing CPR on C.C.J. Burdette testified that at some point she heard Petitioner on the phone and she believed that Petitioner did not realize the seriousness of C.C.J.'s condition. They then placed C.C.J. in a cold shower and Petitioner tried to revive C.C.J. Petitioner then called an ambulance. Upon their arrival, the EMTs described C.C.J. as having blue skin and was essentially not breathing. He collapsed into a vegetative state. C.C.J. died on November 19, 2008, after being removed from life support.

Burdette testified that Petitioner told her sometime after C.C.J.'s funeral that he felt responsible for C.C.J.'s death because he had "shot C.C.J. up with an oxycontin 30." On cross-examination, Burdette testified that on

93                                   4

the night of November 13, 2008, she had approximately ninety valium pills in her possession. She testified that when she woke up and found Petitioner awake, he asked her for a valium. When she went to her purse she found all of the pills missing.

Detective J.K. Sizemore of the Fayette County Sheriff's Department investigated the case. Detective Sizemore obtained recorded telephone conversations which were admitted at trial between Petitioner and C.C.J.'s mother, Naomi Griffith, while she was an inmate at Lakin Correctional Facility. During one of the conversations, Petitioner admitted to Ms. Griffith that C.C.J. had "snorted" a "30." In another phone call he stated that C.C.J. had been obtaining drugs from "other places too."

Dr. Zia Sabet of the West Virginia Medical Examiner's Officer performed an autopsy on C.C.J. According to C.C.J.'s death certificate, the immediate cause of his death was "hypoxic encephalopathy due to broncho-pneumonia and cystic fibrosis." The other significant condition listed was diabetes mellitus, Type I. The certificate was signed by Dr. Zia Sabet. The death was classified as "natural" on the certificate.

The official toxicology report issued by Dr. James Kraner, Chief Toxicologist of the State Medical Examiner's office, on January 21, 2009, states that traces of oxycodone in the blood samples first taken at the hospital on November 14, 2008, were 0.06 mg/L, and that diazepam and nordiazepam [2] were found at levels of 0.04 mg/L and 0.15 mg/L respectively. All of these levels were considered to be therapeutic.[3] Blood samples taken at the time of C.C.J.'s death contained similar levels of diazepam and nordiazepam.

On May 22, 2009, Detective Sizemore obtained an arrest warrant for Petitioner charging him with "death of a child by a parent" in violation of W. Va.Code § 61–8D–2a. Petitioner was arrested and taken into custody on May 27, 2009. Subsequently, on July 28, 2009, Dr. Sabet and Dr. Kaplan issued a "Report of Death Investigation and Post–Mortem Examination Findings." The reports states that

"It is our opinion that [C.C.J.], a 14–year–old male teenager, died as the result of combined oxycodone and diazepam intoxication

[729 S.E.2d 258]

resulting in fatal hypoxic encephalopathy following a 5–day hospitalization, without documented prescription access to oxycodone and diazepam. Cystic Fibrosis and insulin dependent diabetes mellitus are potentially contributory conditions."

As to the manner of death, the report states,

"[g]iven the uncertain circumstances surrounding the acquisition and fatal abuse of pharmaceuticals by this minor child, as well as the potentially contributory role of unreported caretaker neglect to provide timely medical rescue, the manner of death is best classified as Undetermined."

Petitioner was indicted before the Fayette County Grand Jury for the felony offenses of "felony murder" in violation of W. Va.Code § 61–2–1; "delivery of a controlled substance, to-wit oxycodone" in violation of W. Va.Code § 60A–4–401; "death of a child by a parent, guardian or custodian" in violation of W. Va.Code § 61–8D–2a; and "child neglect resulting in death" in violation of W. Va.Code § 61–8D–4a(a).

At the jury trial, the Court agreed to instruct the jury that the charge contained in count four, "child neglect resulting in death" (W. Va.Code § 61–8D–4a(a)) is a lesser included offense of count three, "death of a child by a parent" (W. Va.Code § 61–8D–2a). Following the close of evidence, during deliberations, the jury passed a

94

5

note to the bailiff with the following question: "Does the felony that was committed have to *cause* the death or *contribute* to it?" (emphasis in original). After argument of counsel, the Court passed a note back to the jury stating,

Ladies and gentlemen of the jury, I have received your note and regret that I am unable to further answer the question you asked. I know you were attentive to the instructions as they were read to you by the Court. They cannot be read to you again. Each individual should rely upon their own memory in answering the question. You may now continue to deliberate toward verdicts in this case.[4]

Following several more hours of deliberation, the jury returned a verdict finding Petitioner guilty of the offense of "felony murder" (with a recommendation of mercy), and guilty of the offense of "child neglect resulting in death" as a lesser included offense of "death of a child by a parent, guardian or custodian." By sentencing order dated June 28, 2010, the circuit court sentenced Petitioner to consecutive sentences of life with a recommendation of mercy on the count of felony murder, and three to fifteen years on the count of "child neglect resulting in death." Following sentencing, Petitioner filed the instant appeal.

## II.
## STANDARD OF REVIEW

When a Petitioner raises a sufficiency of the evidence argument, this Court follows the standard of review set forth in Syllabus Point 3 of *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995), which provides that:

A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. To the extent that our prior cases are inconsistent, they are expressly overruled.

This Court has also stated that:

The function of an appellate court when reviewing the sufficiency of the evidence to

[729 S.E.2d 259]

support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

*Id.*, Syl. Pt. 1.

We review a circuit court's exclusion of evidence under an abuse of discretion standard. "[R]ulings on the admissibility of evidence are largely within a trial court's sound discretion and should not be disturbed unless there has been an abuse of discretion." *State v. Guthrie*, 205 W.Va. 326, 332, 518 S.E.2d 83, 89 (1999) ( quoting *State v. Louk*, 171 W.Va. 639, 643, 301 S.E.2d 596, 599 (1983), *citing* Syl. Pt. 2, *State v. Peyatt*, 173 W.Va. 317, 315 S.E.2d 574 (1983)).

" 'The action of a trial court in admitting or excluding evidence in the exercise of its discretion will not be disturbed by the appellate court unless it appears that such action amounts to an abuse of discretion.' Syl. pt. 5, *Casto v. Martin* [159 W.Va. 761], 230 S.E.2d 722 (W.Va.1976) citing Syl. pt. 10, *State v. Huffman*, 141 W.Va. 55, 87 S.E.2d 541 (1955).' Syllabus Point 2, *State v. Rector*, [167] W.Va. [748], 280 S.E.2d 597 (1981).' Syl. pt. 3, *State v. Oldaker*, [172] W.Va. [258], 304 S.E.2d 843 (1983)."

Syllabus Point 6, *State v. Kopa*, 173 W.Va. 43, 311 S.E.2d 412 (1983).

With these standards in mind, the parties' arguments will be considered.

# III.
# DISCUSSION

### A. Election of Charges

In his first assignment of error, Petitioner maintains that the circuit court erred in allowing the State to proceed against him for the offenses of "felony murder," the underlying felony being delivery of oxycodone; "death of a child by a parent," the cause of death being "impairment of physical condition by delivery of oxycodone;" and "child neglect resulting in death," the neglect allegedly being "allowing or permitting child to abuse oxycodone." Petitioner's counsel filed a "Motion to Elect" requesting that the State elect a count in the indictment and a theory under which to proceed. Another similar motion was made by Petitioner while arguing for a judgment for acquittal after the end of the State's case, and then again at the close of evidence. Petitioner alleges that the issue was also addressed during discussions regarding instructions and how to draft the verdict form.

Petitioner argues that the circuit court failed to require the State to elect a theory of prosecution in two different manners. First, Petitioner argues that it was inappropriate for the State to indict for felony murder alleging a specific felony of delivery of a controlled substance in count one of the indictment, and then indict for that same underlying felony in count two of the indictment. Indeed, this Court has held that

"[d]ouble jeopardy prohibits an accused charged with felony murder, as defined by W. Va.Code § 61–2–1 (1977 Replacement Vol.) from being separately tried or punished for both murder and the underlying enumerated felony." Syllabus point 8, *State v. Williams*, 172 W.Va. 295, 305 S.E.2d 251 (1983).

Syl. pt. 8, *State v. Giles*, 183 W.Va. 237, 395 S.E.2d 481 (1990).

It would have been clear error in this case for Petitioner to be convicted of both the offense of felony murder and the underlying offense of delivery of a controlled substance. However, when the circuit court prepared the verdict form and sent the charge of felony murder to the jury, the charge of "delivery of a controlled substance" in count two was not given to the jury as a separate and distinct offense upon which a verdict of guilt could be returned. This Court has previously stated that "[t]he granting of a motion to force the State to elect rests within the discretion of the trial court, and such a decision will not be reversed unless there is a clear abuse of discretion." Syl. Pt. 3,

[729 S.E.2d 260]

*96*

7

*State v. Walker*, 188 W.Va. 661, 425 S.E.2d 616 (1992). When we review the nature of the charges for which Petitioner was indicted, we conclude that the State could have reasonably established the requisite malice or intent required for proving the offense of "death of a child by a parent" by proving that Petitioner delivered a controlled substance to his child that resulted in C.C.J.'s death. Thus, we find no abuse of discretion by the circuit court in waiting until it prepared the verdict form to dismiss count two of the indictment. The jury was not permitted to consider the underlying offense of delivery of a controlled substance as a separate and distinct felony offense. Thus, we find no error on this issue.

Additionally, Petitioner alleges that the circuit court failed to require the State to elect between a prosecution theory of felony murder or "death of a child by a parent." In other words, fundamentally, Petitioner alleges that it violated double jeopardy to prosecute him for both offenses that arose from the single act of delivering a controlled substance to his child. Petitioner maintains that our Legislature has not explicitly permitted multiple prosecutions for different offenses arising from a single act. We conclude that Petitioner's allegation is without merit.

This Court has held that

"[t]he Double Jeopardy Clause in Article III, Section 5 of the West Virginia Constitution, provides immunity from further prosecution where a court having jurisdiction has acquitted the accused. It protects against a second prosecution for the same offense after conviction. It also prohibits multiple punishments for the same offense."

Syllabus Point 1, *Conner v. Griffith*, 160 W.Va. 680, 238 S.E.2d 529 (1977). When the jury returned its verdict in this case, Petitioner was not convicted of the offense of "death of a child by a parent." Rather, he was convicted only of the lesser included offense of "child neglect causing death." [5] Because Petitioner was not convicted of the offense which he claims violates double jeopardy, "death of a child by a parent," Petitioner fails to demonstrate that he suffered multiple punishments or any similar other harm by allowing the jury to consider this charge along with the charge of felony murder. While perhaps it would have been more appropriate for Petitioner to allege a double jeopardy violation regarding the two offenses for which he was actually convicted, felony murder and "child neglect resulting in death," Petitioner's counsel represented during oral argument that he is not appealing Petitioner's conviction for this offense. Accordingly, we will not consider that issue. 

## B. Sufficiency of Evidence

In the next assignment of error, Petitioner alleges that in proceeding under a felony murder theory, the State's evidence was insufficient to prove that: 1) the delivery of the oxycodone itself caused the death of C.C.J. and 2) that Petitioner delivered either of the controlled substances, oxycodone or valium, to C.C.J. We will address each of these issues in turn.

## 1) Causation

Petitioner bases his first argument primarily on the testimony of Dr. Kraner and Dr. Sabet who both opined that it was the combination of oxycodone and valium that caused C.C.J.'s death. Petitioner alleges that neither expert could opine that the oxycodone itself caused C.C.J.'s death. Further, Petitioner places great weight on the evidence indicating that both drugs found in C.C.J. were at "therapeutic" levels. Conversely, the State argues that there was sufficient evidence presented to the jury from which the jury could convict, and the jury did convict, Petitioner of felony murder.



The crux of Petitioner's argument, while rather inartful, appears to be that the State must prove that the delivery of the oxycodone was the sole cause of C.C.J.'s death in order to sustain his conviction. We reject this argument because it is wholly unsupported

[729 S.E.2d 261]

by the felony murder statute, W. Va. Code § 61–2–1 (1991), as well as our jurisprudence.

In 1991, the West Virginia Legislature added the felony offense of "manufacturing or delivering a controlled substance as defined in article four, chapter sixty-a of this code" to the specifically enumerated list of felonies that may be the basis for first degree murder. West Virginia Code § 61–2–1 (1991) provides the following:

Murder by poison, lying in wait, imprisonment, starving, or by any willful, deliberate and premeditated killing, or in the commission of, or attempt to commit, arson, kidnapping, sexual assault, robbery, burglary, breaking and entering, escape from lawful custody, or *a felony offense of manufacturing or delivering a controlled substance* as defined in article four, chapter sixty-a of this code, is murder of the first degree. All other murder is murder of the second degree.

In an indictment for murder and manslaughter, it shall not be necessary to set forth the manner in which, or the means by which, the death of the deceased was caused, but it shall be sufficient in every such indictment to charge that the defendant did feloniously, willfully, maliciously, deliberately and unlawfully slay, kill and murder the deceased.

This Court has held that "[i]n any case of homicide there must be proof of the identity of the deceased and the causation of death." *State v. Myers,* 171 W.Va. 277, 280, 298 S.E.2d 813, 817 (1982). "Under our decisions, the corpus delicti consists in cases of felonious homicide, of two fundamental facts: (1) the death; and (2) the existence of criminal agency as a cause thereof. The former must be proved either by direct testimony or by presumptive evidence of the strongest kind, but the latter may be established by circumstantial evidence or by presumptive reasoning upon the facts and circumstances of the case." Syllabus Point 6, *State v. Beale,* 104 W.Va. 617, 141 S.E. 7, 141 S.E. 401 (1927). Unlike traditional first degree murder, felony-murder does not "require proof of the elements of malice, premeditation, or specific intent to kill. It is deemed sufficient if the homicide occurs accidentally during the commission of, or the attempt to commit, one of the enumerated felonies." Syllabus Point 7, in part, *State v. Sims,* 162 W.Va. 212, 248 S.E.2d 834 (1978). "The felony-murder statute applies where the initial felony and the homicide are parts of one continuous transaction, and are closely related in point of time, place, and causal connection, as where the killing is done in flight from the scene of the crime to prevent detection or promote escape." Syl. Pt. 2, *State v. Wayne,* 169 W.Va. 785, 289 S.E.2d 480 (1982). We have explained, with regard to felony murder, that:

"The elements which the State is required to prove to obtain a conviction of felony murder are: (1) the commission of, or attempt to commit, one or more of the enumerated felonies; (2) the defendant's participation in such commission or attempt; and (3) the death of the victim *as a result of* injuries received during the course of such commission or attempt." *State v. Williams,* 172 W.Va. 295, [311,] 305 S.E.2d 251, 267 (1983).

Syl. Pt. 5, *State v. Mayle,* 178 W.Va. 26, 357 S.E.2d 219 (1987) (emphasis added).

In *State v. Durham,* 156 W.Va. 509, 195 S.E.2d 144 (1973), a voluntary manslaughter case, this Court discussed whether the criminal agency of the defendant caused the death of her husband, where the defendant had shot her husband, but the medical evidence revealed that the bullet wound by itself would not have caused



the death. *Id.* at 516, 195 S.E.2d at 148. It was determined that the direct cause of death was a fatty liver, and the death was accelerated or triggered by administration of anesthesia during surgery to repair the wound or another chemical agent, or by trauma caused by the bullet. *Id.* at 513–15, 195 S.E.2d at 147–48. In other words, the wound would not have caused the death, but for the pre-existing physical disability and/or subsequent treatment. Neither of the doctors could say with certainty that either of these was the causative factor, but testified to the probability that one or the other triggered or accelerated the death. *Id.* at 520, 195 S.E.2d at 150.

[729 S.E.2d 262]

In discussing the corpus delicti requirement of proving causation for purposes of obtaining a conviction for voluntary manslaughter, this Court stated:

The law in practically every American jurisdiction, including West Virginia, is that the corpus delicti in cases of felonious homicide consists of two basic elements: (1) Death of the victim; and (2) the existence of a criminal agency as a cause thereof. 40 C.J.S. *Homicide* Section 186, pages 1086–1087; 40 Am.Jur.2d, *Homicide*, Section 4, page 297; *State v. Craig*, 131 W.Va. 714, 51 S.E.2d 283 [ (1948) ]; *State v. Koontz*, 117 W.Va. 35, 183 S.E. 680 [ (1936) ]; *State v. Beale*, 104 W.Va. 617, pt. 6 syl., 141 S.E. 401 [ (1927) ]. Most of the cases decided in West Virginia concerning the proof of the corpus delicti relate to establishing the death of the victim or to the existence of a criminal agency. *State v. Craig*, 131 W.Va. 714, 51 S.E.2d 283; *State v. Koontz*, 117 W.Va. 35, 183 S.E. 680; *State v. Lucas*, 103 W.Va. 743, 138 S.E. 393 [ (1927) ]; *State v. Gilfillen*, 96 W.Va. 660, 123 S.E. 578 [ (1924) ]; *State v. Roush*, 95 W.Va. 132, 120 S.E. 304 [ (1923) ]; *State v. Merrill*, 72 W.Va. 500, 78 S.E. 699 [ (1913) ]; *State v. Flanagan*, 26 W.Va. 116 [ (1885) ].

...

It is, of course, not indispensable to a conviction for murder that the wounds be the direct cause of death. It is sufficient if the initial wound caused the death indirectly through a chain of natural causes. Text writers in general take a uniform position on the effect of a pre-existing physical condition.

'It is equally well settled that the consequences of an act which is the efficient cause of the death of another are not excused, nor is the criminal responsibility for causing death lessened, by the pre-existing physical condition of the person killed ... which rendered him unable to withstand the shock of the wound inflicted, and without which predisposed condition the blow would not have been fatal ...' 40 Am.Jur.2d, Homicide, Section 20, page 313.

It is immaterial that the accused did not know that the deceased was in a feeble condition which facilitated the killing. 'Responsibility for homicide attaches to one who accelerates the death of a person in poor physical condition ...' 40 C.J.S. *Homicide*, Section 11(d), page 855. See also 40 Am.Jur.2d, *Homicide*, Sections 15–16, pages 306–07.

It is also clear that foreseeability is not an element in the corpus delicti. Causation, as we consider it here, is not the type of causation involved in tort liability. It is not necessary that the defendant could have reasonably anticipated that her act would cause death. 40 C.J.S. *Homicide*, Section 11(d), page 856.

As can be gleaned from this discussion, the great weight of authority in this country holds a defendant criminally responsible where he inflicts a wound resulting in death, even though the cause of death is related to the proper treatment of the wound or such treatment or effect of a pre-existing physical disability of the victim. We hold this to be the law of this State governing this case.

10

To hold, however, that the defendant in this case was responsible, we must find that the corpus delicti was established by direct evidence or by cogent and irresistible grounds of presumption and that such death was not due to natural or other causes in which the accused did not participate. *State v. Roush,* 95 W.Va. 132, 120 S.E. 304; *State v. Merrill,* 72 W.Va. 500, 78 S.E. 699.

The death of the victim must be proved by direct testimony or by presumptive evidence of the strongest kind, but the existence of a criminal agency as the cause thereof, can be established by circumstantial evidence and presumptive reasoning from the facts and circumstances of the case. *State v. Beale,* 104 W.Va. 617, 141 S.E. 401; *State v. Merrill, supra; State v. Flanagan,* 26 W.Va. 116.

*Durham,* 156 W.Va. at 515–20, 195 S.E.2d at 148–50 (1973).

In recognizing these principles of law, this Court held in *Durham* that the medical testimony can be characterized at

[729 S.E.2d 263]

least as circumstantial evidence relating to the cause of the death. *Id.* at 519–20, 195 S.E.2d at 150. The non-medical, circumstantial evidence on the question of causation was likewise properly presented to the jury. *Id.* The jury, thus properly instructed, had for its consideration direct and conclusive evidence of the death and competent circumstantial evidence that the defendant's criminal agency caused the death. *Id.* Accordingly, in *Durham,* this Court could not conclude that the jury was wrong. *Id.* at 518–20, 195 S.E.2d at 150–51. In so holding, the Court established the following two syllabus points:

In order to sustain a conviction for felonious homicide, the corpus delicti is properly proved by sufficient evidence showing that the initial wound caused the death *indirectly through a chain of natural causes.*

*Id.,* Syl. Pt. 2. (Emphasis added).

A defendant may be held criminally responsible where he inflicts upon another a wound resulting in death, even though the cause of death is related to the proper treatment of the wound or related to such treatment or effect of a pre-existing physical disability of the victim.

*Id.,* Syl. Pt. 3.

Petitioner suggests that this Court's opinion in *State v. Rodoussakis,* 204 W.Va. 58, 511 S.E.2d 469 (1998), a case involving felony murder with the underlying felony being "delivery of a controlled substance," is determinative for the purposes of the instant appeal. In *Rodoussakis,* the defendant raised two separate arguments regarding the failure of the State to prove its case against the defendant beyond a reasonable doubt. *Id.* at 64, 511 S.E.2d at 475. First, the defendant contended that the State's evidence was insufficient to trigger application of the felony murder statute. *Id.* Specifically, the defendant asserted that the felony murder statute did not apply in drug overdose cases. *Id.* The defendant argued that by using the word "murder" in W. Va.Code § 61–2–1, the Legislature intended that the felony murder rule apply only in cases of intentional death. *Id.* at 65 n. 3, 511 S.E.2d at 476, n. 3. In concluding that the defendant's intent, or lack thereof, to cause a drug overdose was not central to a consideration of whether the felony murder statute applied, this Court noted that "where a

homicide occurs in the course of, or as a result of, a separate, distinct felony, the felonious intent involved in the underlying felony may be transferred to supply the intent to kill necessary to characterize the homicide as murder." *Id.* at 65, 511 S.E.2d at 476, n. 3 (citing *State v. Young*, 173 W.Va. 1, 16–17, 311 S.E.2d 118, 134 (1983)) (emphasis added). Applying the clear and unambiguous language of W. Va.Code § 61–2–1 and the intent of the Legislature in enacting the statute, we held that

> [p]ursuant to W. Va.Code § 61–2–1 (1991), death resulting from an overdose of a controlled substance as defined in W. Va.Code § 60A–4–401 *et seq.* and occurring in the commission of or attempt to commit a felony offense of manufacturing or delivering such controlled substance, subjects the manufacturer or deliverer of the controlled substance to the felony murder rule.

*Id.,* Syl. Pt. 3.


Next, the defendant in *Rodoussakis* argued that there was no evidence showing whether the morphine which actually caused the victim's death was delivered to the victim by the defendant, or whether it was self-administered without the defendant's involvement. *Id.* at 65, 511 S.E.2d at 476–77. However, this Court declined to address this specific assignment of error, finding that while the defendant sought relief below asserting that there was insufficient evidence that morphine, as opposed to other drugs in the victim's system, caused the victim's death, the defendant failed to argue below that there was insufficient evidence that the defendant's morphine, rather than the victim's own morphine, caused the victim's death. *Id.* at 65–66, 511 S.E.2d at 476–77. Thus, this Court concluded that the issue had not been appropriately preserved for purposes of appeal. *Id.* at 66, 511 S.E.2d at 477.

Here, Petitioner contends that the State's evidence did not sufficiently prove that the oxycodone caused C.C.J.'s death because Dr. Sabet did not offer any testimony as to which drug, the oxycodone or the valium, was the lethal or first effective drug, as he did in the *Rodoussakis* case. Petitioner points to the

[729 S.E.2d 264]

medical testimony presented by Dr. Sabet in *Rodoussakis,* where he opined that the cause of death was "multiple drug intoxication ... the first effective drug was morphine, the second alcohol, and the third cocaine." Dr. Sabet concluded that if the morphine were taken out of the victim's system, he would not have died when he did. Two other experts agreed with this conclusion. *Id.* However, as stated above, this Court did not consider the issue of whether there was sufficient evidence to prove that the defendant's act of delivering morphine to the victim caused the victim's death because the issue had not been properly preserved for purposes of appeal. Thus, we do not find *Rodoussakis* helpful in determining the issue before us.

Taking all of these prior decisions into consideration, we conclude in order to obtain a conviction for felony murder, all that the State was required to prove was that the death was simply *a result of* the delivery of the oxycodone. Nothing in our prior jurisprudence leads us to conclude that the State was required to prove that the delivery of the oxycodone was the sole cause of C.C.J.'s death. Thus, we cannot say that the circuit court erred in determining that the evidence was sufficient to prove that C.C.J.'s death was the result of the delivery of the oxycodone by Petitioner.

In this case, the State presented evidence that Petitioner traded C.C.J.'s Jeff Gordon memorabilia collection for three oxycodone pills and that Petitioner delivered a pill to C.C.J.[6], which resulted in his death. The July 28, 2009 "Report of Death Investigation and Post–Mortem Examination Findings" issued by Dr. Sabet and Dr. Kaplan states that

"It is our opinion that [C.C.J.], a 14–year–old male teenager, died *as the result of combined oxycodone and diazepam intoxication* resulting in fatal hypoxic encephalopathy following a 5–day hospitalization, without documented prescription access to oxycodone and diazepam. Cystic Fibrosis and insulin dependent diabetes mellitus are potentially contributory conditions."

As to the manner of death, the report states,

"[g]iven the uncertain circumstances surrounding the acquisition and fatal abuse of pharmaceuticals by this minor child, as well as the potentially contributory role of unreported caretaker neglect to provide timely medical rescue, the manner of death is best classified as Undetermined."

(Emphasis added).

While Dr. Sabet and Dr. Kaplan determined that the drugs found in C.C.J.'s blood were at a therapeutic levels, Dr. Sabet explained during his testimony at trial that a patient with cystic fibrosis may not be able to properly metabolize even a therapeutic concentration of these drugs. Shedding further light on his conclusions regarding the manner of death, Dr. Sabet offered the following testimony:

Q: Doctor, would you explain for us—in arriving at your cause of death, would you explain to the jury how, if at all, the presence of these controlled substances in this boy's body impacted or affected your ultimate conclusion in this case?

A: When you have multi-system organ failure, like the liver cirrhosis, pancreas, cystic fibrosis, lungs, he cannot breathe very well because of the mucous and other pathology findings that I cannot explain it here. And you see on the (unintelligible) examination, this person is defective, means he is—he cannot resist even normal concentration of drug. Even therapeutic concentration of prescribed drug could affect—could then metabolize or metabolize this drug from the system and could affect fatal consequence of this drug, even in normal persons like you and me.

Q: If—let me ask you this question and see if—see how this goes. Tell us, Doctor, looking at your report, which you have a copy of, what did you ultimately come to an opinion in terms of the cause of death and the manner of death?

A: Cause of death for this 14–year–old male teenager is combined oxycodone

[729 S.E.2d 265]

and diazepam intoxication, based on this organ failure, and cystic fibrosis associated with diabetes mellitus, which is what Type I from the chart that he had, could be contributing factor to his death.

And manner is, because of the not therapeutic concentration of the oxycodone and Valium, and also (unintelligible) of reported caretaker's neglect to provide timely medical rescue, because based on the investigation that we received by the law enforcement, this father a few times rejected to take this teenager to the medical facility and even tried to treat in the tub with the ice or cold water.

These all could be contributing factors to his death. And manner of death is classified as undetermined, because we don't know really if this therapeutic drug concentration—I'm not hundred percent sure.

Thus, based on the fact that C.C.J. had a pre-existing condition, of which Petitioner was acutely aware, that rendered him unable to properly metabolize the oxycodone, and the medical experts' opinion that the cause of C.C.J.'s death was combined oxycodone and diazepam intoxication, we find that the evidence sufficiently established that the oxycodone in C.C.J.'s system resulted in his death. In *State v. Guthrie*, 194 W.Va. 657, 461

13

(12)

S.E.2d 163 (1995), this Court held that "[t]he function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted to trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt." *Id.*, Syl. Pt. 1. When we review the evidence in this case in the light most favorable to the prosecution, we conclude that any rational trier of fact could have found the essential elements of the crime of felony murder proved beyond a reasonable doubt. Accordingly, we find no error with the circuit court's denial of Petitioner's motions for judgment of acquittal made during trial.

## 2) Delivery

In his second argument regarding the sufficiency of the evidence, Petitioner also alleges that the State failed to prove that he personally delivered the oxycodone to C.C.J. because no witnesses were presented that saw Petitioner give C.C.J. the pill. We accord this argument scant merit. At trial, Burdette provided testimony that although she never saw Petitioner give C.C.J. the third oxycodone pill that Petitioner got from Mr. Settle, Petitioner told her sometime after C.C.J.'s funeral that he felt responsible for C.C.J.'s death because he had "shot C.C.J. up with an oxycontin 30." The jury also heard evidence regarding several recorded phone calls between Petitioner and C.C.J.'s mother which could have led them to conclude that Petitioner delivered the oxycodone pill to C.C.J. Detective Sizemore obtained recorded telephone conversations which were admitted at trial between Petitioner and C.C.J.'s mother, Naomi Griffith, while she was an inmate at Lakin Correctional Facility. During one of the conversations, Petitioner admitted to Ms. Griffith that C.C.J. had "snorted" a "30." In another phone call he stated that he knew that C.C.J. had been obtaining drugs from "other places too."

In determining whether there is sufficient evidence to support a jury's verdict, "[a]n appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." Syl. Pt. 3, in part, *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163. Assessing the above referenced evidence in the light most favorable to the prosecution, we find that the evidence was

[729 S.E.2d 266]

sufficient for a jury to conclude that the element of delivery of the oxycodone had been proven beyond a reasonable doubt.

## C. Jury Instructions

Next, Petitioner alleges that the jury was not properly instructed and that it was therefore confused in determining whether the felony had to cause the death or contribute to it. The circuit court adopted the State's instruction regarding felony murder without objection from Petitioner's counsel regarding the statement of law contained therein. The felony murder instruction that the jury received at trial, provided, in pertinent part:

You may, if warranted by the law and the evidence, return one of the following verdicts as to Count 1 of the indictment: Guilty of murder in the first degree, a felony, as a result of the death of [C.C.J.] occurring during the commission of the felony crime of delivery of oxycodone, a controlled narcotic substance, with no recommendation of mercy; No. 2, guilty of murder in the first degree, a felony, as a result of the death of

103

[C.C.J.] occurring during the commission of the felony crime of delivery of oxycodone, a controlled narcotic substance with a recommendation of mercy; No. 3, not guilty.

Murder in the first degree is committed when any person in the commission of the delivery of a controlled substance causes the death of another person. Under the felony murder doctrine, murder in the first degree does not require proof of the elements of willfulness, deliberation, premeditation, malice or specific intent to kill. It is deemed sufficient in law if the death occurs during the commission of the delivery of a controlled substance.

Delivery of oxycodone, a Schedule II narcotic controlled substance, is committed when any person unlawfully and feloniously delivers oxycodone, a Schedule II narcotic controlled substance, to another person.

Before the defendant, Henry C. Jenkins, can be found guilty of murder in the first degree, a felony murder, as a result of the death of [C.C.J.] occurring during the commission of the felony crime of delivery of a controlled substance, the State of West Virginia must prove beyond a reasonable doubt the following: That the defendant, Henry C. Jenkins, in Fayette County, West Virginia, on or about November 14, 2008, did deliver oxycodone, a Schedule II narcotic controlled substance, to [C.C.J.] and that [C.C.J.] died as a result of the defendant committing the crime of delivery of a controlled substance.

If you should find the defendant, Henry C. Jenkins, guilty of murder in the first degree, a felony murder, as a result of the death of [C.C.J.] occurring during the commission of the felony crime of delivery of a controlled substance, you may, in your discretion, add to your verdict a recommendation of mercy.

During deliberations at trial, the jury passed a note to the bailiff with the following question: "Does the felony that was committed have to *cause* the death or *contribute* to it?" (Emphasis in original). The parties discussed at length whether the State was required by law to prove that the oxycodone caused C.C.J.'s death. In analyzing whether the instruction was a proper statement of the law, the circuit court noted that the felony murder statute does not contain the word "cause" or "contribute," rather it merely requires that the murder occur "in the commission of or attempt to commit the felony offense of delivering a controlled substance." The court also noted that West Virginia case law merely requires that "the initial felony and the homicide are parts of one continuous transaction, and are closely related of point in time, place and causal connection," *see* Syl. Pt. 2, in part, *State v. Wayne*, 169 W.Va. 785, 289 S.E.2d 480, and "the death of the victim as a result of injuries received during the course of such commission or attempt." *See* Syl. Pt. 5, in part, *State v. Mayle*, 178 W.Va. 26, 357 S.E.2d 219. Thus, the court decided that because the words "cause" and "contribute" were not an accurate reflection of the law, it would not re-read the previous instruction to the jury that the delivery of oxycodone had to cause the death.

The State then proposed that as an alternative, the court could simply read the language

[729 S.E.2d 267]

contained in the felony murder statute instead. Petitioner's counsel objected and stated that the instruction that was read to the jury was the State's proposed instruction, not Petitioner's, and that the language used in that instruction is what the defense relied upon in its argument to the jury. Taking this into consideration, Petitioner's counsel suggested that it would be best to leave the issue alone and simply write a note to the jury stating that the court could not answer the question, as the jury had already heard the court's instructions. After the parties had opportunity to review and agree to the language contained therein, the judge returned a note to the jury stating

Ladies and gentlemen of the jury, I have received your note and regret that I am unable to further answer the question you asked. I know you were attentive to the instructions as they were read to you by the Court.

*109*

They cannot be read to you again. Each individual should rely upon their own memory in answering the question. You may not continue to deliberate toward verdicts in this case.

When we review the record and consider the series of events that occurred before the circuit court, we find that Petitioner has waived any argument that the court committed error in not providing further clarification on the issue of causation. Petitioner's counsel was the one who actually suggested that the court not answer the jury's question. Accordingly, Petitioner is foreclosed from claiming that this tactical decision was erroneous. Although the jury instruction admittedly confused the jury as to whether causation was required to prove felony murder, Petitioner was not prejudiced by having this instruction read to the jury. Even if the jury had inferred that the State had to prove that oxycodone itself "caused" the death of C.C.J., this would have been a heavier burden of proof for the State to carry to obtain a conviction. If anything, the instruction inured to the benefit of Petitioner.

### D. Suppression of Petitioner's Statement

Petitioner next contends that the circuit court's decision to suppress his statement only for purposes of the State's case in chief was erroneous. Detective Sizemore and Detective Ron Perdue went to the home of Petitioner on May 27, 2009, to interview Petitioner. Based on the investigation and the statements of other witnesses, Detective Sizemore had obtained a warrant for Petitioner on May 22, 2009. Detective Sizemore testified that at the interview on May 27, 2009, he read Petitioner his Miranda rights. The interview took place outside Petitioner's house and the parties apparently chatted amiably and smoked cigarettes along the road. The detectives never informed Petitioner of whether he was under arrest, or whether he was free to leave.[2] Petitioner was not placed in handcuffs during the interrogation, but was arrested immediately after the interview. Detective Sizemore admitted that he had the arrest warrant in his pocket during the interview.

Following a hearing on Petitioner's motion to suppress the statement, the circuit court concluded that the purpose and manner of conduct of the interview was to induce a statement, and thus suppressed the State's ability to utilize the statement in its case in chief. The court, however, denied the defense motion to prohibit the use of the statement for any purpose at trial and allowed its use on rebuttal to impeach Petitioner should he choose to testify at trial. Petitioner contends it was error for the circuit court to permit the use of this statement for impeachment purposes. Specifically, he contends that the court's ruling deterred him from testifying and thus, severely prejudiced his case. The State responds that although the circuit court's ruling permitted the statement

[729 S.E.2d 268]

to be used on rebuttal for the limited purpose of impeachment, the State did not use the statement during the trial for any purpose out of an abundance of caution. Thus, it contends that Petitioner fails to demonstrate any prejudice caused by this ruling.

We find no error in the circuit court's ruling. As this Court explained in *State v. Goff*, 169 W.Va. 778, 289 S.E.2d 473 (1982), examination of a confession involves two distinct voluntariness inquiries. Where a confession is obtained in violation of *Miranda*, it is involuntary in law and is inadmissible in the State's case. *Id.* at 782, 289 S.E.2d at 476. The confession may, however, be used to impeach the defendant's trial testimony, provided it was not the product of improper coercion. *Id.* at 782–83, 289 S.E.2d at 476. We stated the applicable rule in Syllabus Point 4 of *State v. Goodman*, 170 W.Va. 123, 290 S.E.2d 260 (1981):

Where a person who has been accused of committing a crime makes a voluntary statement that is inadmissible as evidence in the State's case in chief because the statement was made after the accused had requested a lawyer, the statement may be admissible solely for impeachment purposes when the accused takes

EXHIBIT-MENTAL HISTORY

# [EXHIBIT-MENTAL HISTORY]

106

## PERTINENT FACTS OF MENTAL HEALTH ISSUES

Petitioner/Defendant, Edward Jess Dreyfuse does in fact have an extensive History of Menatl Health Issues, Those being;

1) Petitioner was hospitalized on 4 seperate occaisions for attempted Suicides before his 15 th Birthday, the 1st time being at age 9 for an intentional overdose of 120 primatine asthma pills where there was hospitilization at Todds Childrens Hospital, Youngstown, Ohio.

2) Petitioner was an Abused Child and underwent brutal torture, and in fact his Biological Mother was convicted for such when she had went so far as to break BOTH of the Petitioners arms at age 8 by beating the Petitioner with a club, she was Sentenced to 5 years in Muncy State Prison for women in 1974 and the Petitioner was placed in Foster Care for nearly a year under supervision of the Penn. Dept. of Child Welfare, Case Worker, Sandy Copper.

3) Petitioner was sent to live with his Biological Father at age 9, where he once again suffered severe Physical and Psychological abuse, and Petitioner began attempting Suicide as a result.

4) Petitioner did run away from his Father's house on his 12th Birthday 6/11/78, and Hitch Hiked to Florida, eating from Dumpsters and sleeping beside them until his Capture and return to his Father in New Castle Pennsylvania.

5) Petitioner's being abused had again escalated to where the School Officials of Ben Franklin Jr. High called in Sandy Copper of the Penn. State Child Welfare Dept. because the Petitioner was beaten so severely that both his eyes were swollen comletely shut, lips were split, ears were collerflowered and bruising suggested near Fatality.

6) Petritioner ran away 5 times from his father from age 12 to 15

7) Petitioner had a Case Worker named Robin Martwinski in Lawrence County, Pennsylvania.

1

8) Petitioner was placed in a Juvenile Facility and at age 16 was released and emancipated, the Petitioner did NOT return to his Fathers House and was in fact on his own since placement at age 15.

9) Petitioner then returned to Florida, and was in fact Homeless for numerous years, and was placed in numerous Mental Facilitites for Suicide Attempts throughout his Adult life.

10) Petitioner attempted suicide by using a Long Rifle belonging to his ex wife, Rachelle Dreyfuse.

11) Petitioner did in fact attempt suicide in 1995 by stabbing himself so severely he required surgery, this was in Meigs County Ohio.

12) Petitioner did in fact attempt suicide in Cabell County W.VA.in the exact same manner of Stabbing at a Hotel located on the West End of Huntington and is a matter of record with City Police.

13) Petitioner has attempted suicide MORE than 10 times from his 17th Birthday to present date.

14) Petitioner was treated for mental health Issues and medicated.

15) Petitioner did in fact explain to Attorney LAishley that he has suffered a severe mental illness from age 8 and asked that he be given a Psychological Evaluation.

16) Attorney Laishley told the Petitioner that the Judge would NEVER allow a Psychological Evaluation and refused to motion the Court for such after being made aware of the extensive mental Issue(s) and History of such.

17) Petitioner was placed on suicide watch while awaiting Trial, as a Result of such, Attorney LAishley told the Petitioner he would kill himself if he was in the Petitioner's shoes.

108

18) Petitioner was in fact a child of two alcoholics who were Abusive Physically and Mentally and subjected the Petitioner to forms of torture as a child that were unbearable.

19) Petitioner was proclaimed by the State to be a Homeless Alcoholic who was Addicted to drugs that lived on the Banks of the Ohio River that allegedly attacked a complete stranger in a residence never before frequented by the Petitioner so as to intentionally murder the unknown stranger(Victim) in a fit of black Rage that was drug and OR alcohol induced, However, even at that being obvious to ANYONE, even a non professional, Attorney John "JACK" Laishley did NOT motion the Court for a Psychological Evaluation, and in fact REFUSED to motion the Court for such.

20) Attorney Laishley Refused to and failed to investigate all of the aforementioned Mental Issues and refused to make the Court aware of the pre existing Mental Issues that are Epic in actual Record and are substantial in the ineffective Assistance of Counsel provided, as any reasonable Attorney would have certainly investigated and also presented the aforementioned Psychological History to the Court for a Menatl Evaluation to be conducted according to law so as to establis Competency of the Petitioner/Defendant, BOTH during the actual Criminal event, and at the time of trial.

21) ALL of the claims made herein are matters of RECORD, and are able to be obtained for presentment, as they should have by Attorney Laishley.

22) There exists a total of 15 documented Suicide attempts that were severe in nature as to require surgeries on 8 seperate accounts.

History of Hospitalization(s) Treatment

Todds Childrens Hospital, Suicide Attempt-Overdose, Youngstown Ohio
Hamot Medical Center, Suicide Attempt- Overdose, Erie Pa.
Jameson Hospital, Suicide Attempt-Overdose, New Castle Pa.
Lawrence County Mental Health Dept.-Hanging Attempt, New Castle Pa.
Lawrence County Dept. Child Welfare-Sandy Copper, New Castle Pa.
Westwwod Hospital, Suicide Attempt, Vehicle, Ft.Pierce Fla.
Vision Quest Inc, Psych Treatment, Franklin Pa.
Ellwood General Hospital, Suicide Attempt, Vehicle, Ellwood City Pa.
Psych Hospital, Sebastian-Suicide Attempt, By Police, Sebastian Fla.
Vetrans Memorial, Suicide Attempt, Stabbed self, Middleport Ohio.
Westmoreland Psych Treatment, Mason W.Va.
Beaver Valley Medical Center, Suicide Attempt, Overdose Alcohol, Beaver Pa
St Mary's Medical Center, Suicide Attempt, Stabbed self, Huntington,W.Va.
Ohio Valley Medical Center, Suicide Attempt alcohol, Wheeling W.Va.
New Martinsville Hosp, Suicide Attempt, Gunshot, New Martinsville, W.Va.

   A mental/Psychological History as evidenced by the above would
cause any reasonable Attorney to Motion a Court for a Psych Eval as
well as constitute a thorough Investigation into such a History of
seroius Psychological problems, the above are verifiable and have
began at Age 9 and are to recent Date, minus a Suicide Attempt at
the Western Regional Jail while awaiting Trial, which Attorney Laishley
was also aware of but REFUSED to inform the Court of such.

1

110

### Psych Records Available

Lawrence County Dept. Child Welfare, New Castle Pa.
Todds Childrens Hosp. Youngstown Ohio.
Lawrence County Juvenile Services, New Castle Pa.
Lawrence County Mental Health Dept. New Castle Pa.
Jameson Memorial Hosp. New Castle Pa.
Vision Quest Inc. Franklin Pa.
Hamot Medical Center. Erie Pa.
Ellwood General, Ellwood City, Pa.
Sebastian Psych Hosp. Sebastian Fla.
Veterans Memorial Hosp. Middleport Ohio.
Beaver Valley Med Center, Beaver Falls Pa.
St. Mary's Med Center, Huntington, W.Va.
OVMC, Wheeling, W.Va.
U.S. Social Security Admin. Washington, D.C.
Dr. Sirus Arya, Huntington, W.Va.
Dr. Westmoreland, Mason, W.Va.
Dr. Shackleford, Wheeling, W.Va.
Dr. Boni, Wheeling, W.Va.
Dr. Schaffer, Williamson, W.Va.

There are many other Doctors which have treated the Petitioner and there should be records of such at various Facilities and places for treatment, Including Rehab(s) that are not lisred at this time.

A Psychological History as evidenced by the above would cause any reasonable Attorney to Motion the Court for a Psych Eval as well as constitute a thorough Investigation into the History of Psych Problems, However, this was NOT presented to the Court NOR was it Investigated as the record clearly shows NO Investigation was ever preformed into the Issue(s) of Competency OR Psychological disorder(s) or the History of such.

2

**EXHIBIT-AFFIDAVIT**

## AFFIDAVIT

**1.)** My name is Edward "Jesse" Dreyfuse, and I have personal knowledge of the matters contained Herein.

**2.)** I was charged with Murder and Burglary, along with two counts of Assault during the Commission of a Felony and Two counts of Brandishing the Two counts of BOTH brandishing and assault during the commission were dismissed by the Court, I went to trial for the Murder and the Burglary charges.

**3.)** I was represented by John "JACK" Laishley, Esq. in this Case.

**4.)** Prior to Trial I asked the Court to remove Mr. Laishley from my Case, The Court denied my request stating to the effect that Attorney Laishley Had money invested in my Case and that He was a capable Lawyer.

**5.)** Prior to Trial I asked the Court to Appoint Co-Counsel, The Court denied this request for the same reason.

**6.)** Mr. Laishley retained a Private Investigator, Greg Cook, to assist in my Case, and informed me that He was my Co-Counsel, He just didn't have a degree in Law.

**7.)** Prior to Trial I spoke with Mr. Laishley and Mr. Cook about several things that supported the fact that I was beaten with a bat, stabbed and Robbed by Several of the State's potential witnesses who were prepared to testify that I attacked the victim, whom I have NEVER met, in the exact same manner as they attacked me.

**8.)** I told Mr. Laishley and Cook that imediately after I was attacked I ran to Go-Mart, 3 houses away, to get to the safety of light and a Public Place, I explained in detail to the Night Clerk how I had been attacked and Robbed and spent approxamately 10 Minutes with the Clerk as would be evidenced by security Video.

121

22

**9.)** To my knowledge, Neither Mr. Laishley Nor Mr. Cook ever investigated this lead.

**10.)** To my knowledge, neither Mr. Laishley Nor Mr. cook supeonaed VIDEO footage from Go-Mart, which would have shown that I was in a Bloody, Beaten state, and would have also had AUDIO of the actual conversation between myself and the night Clerk wherein I explained in detail how I was attacked, Robbed and Stabbed and of my escape.

**11.)** I also told Mr. Laishley and Mr. cook that PRIOR to the incident, me and an old Girlfriend made the decision to reconcile and that she was supposed to come to Huntington to pick me up  the night BEFORE the incident, however her car had broke down and she could not make it down, this was Pre-arranged so there was NO intent of flight...

**12.)** I told Mr. Laishley and Mr. Cook that I called "Karen" (Old Girlfriend) and told her the details of my being attacked and Robbed soon after my arriving back to my apartment, where I was assisted in treating the wounds of being Stabbed and beaten.

**13.)** To my knowledge neither Mr. Laishley nor Mr. Cook ever attempted to contact "Karen" nor did they ever subpoena her to testify.

**14.)** In a telephone conversation with "Karen" from the Jail "Karen" made it clear that neither Mr. Cook or Laishley ever attempted to contact her, AND that she had called the Office of Mr. Laishley repeatedly and was constantly told that Mr. Laishley would retern her call, which NEVER happened.

**15.)** I told Mr. Laishley and Mr. cook that a friend, Duane Conners Came to Huntington to pick me up and drive me back to Parkersburg to "Karen's" as was previously arranged, and that I related to Duane the details of the attack, Robbery and Stabbing.

**16.)** I told Mr. Laishley and Mr. Cook that I had called my Daughter,

122

23

Denise Thompson, and discussed my being Robbed, beaten and Stabbed, to my knowledge they never attempted to contact her either, nor did they subpoena her to testify.

17.) I ttold Mr. Laishley and Mr. Cook that I had called my estranged wife and discussed in DETAIL the events of my being attacked, Robbed and stabbed and narrowly escaping, to my knowledge neither Mr Cook nor Mr. Laishley ever attempted to contact her, nor did they subpoena her to testify.

18.) I told Mr. Laishley and Mr. Cook that I called my sister in Law, Kim Rial, and explained in DETAIL the events that transpired and of my being attacked, Robbed, Stabbed and Beaten, once again, neither Mr. Cook Nor Mr. Laishley ever attempted to contact her, Nor did they subpoena her to testify.

19.) I told BOTH Mr. Laishley and Mr.Cook that ALL of the above mentioned calls took place the morning of the attack, approx began to make calls at 07:00, 7:00 AM, and requested that He subpoena phone records to establish the FACTS of such, to my knowledge neither Mr. Laishley nor Mr. Cook ever subpoenaed those calls.

20.) To my knowledge, Neither Mr. Cook nor Mr. Laishley EVER attempted to contact ANY of the witnesses I mentioned Nor did they ever investigate my CLAIMS nor did the subpoena ANY witnesses to support my Defense.

21.) I also told BOTH, Mr. Laishley and Mr. Cook that I had informed the Wood County Deputies that arrested me that I was Beaten, Robbed and stabbed, and was a victim of such an attack that occured in Huntington, and also made them aware of the Injuries I had by such attack, Officer's names are, Sgt. Allen and Deputy Swiger.

123

22.) To my knowledge neither Mr. Laishley nor Mr. Cook attempted to contact the Deputies that I had made the statement(s) to, nor did they subpoena either Deputy, or present my statement to the Deputies as evidence at Trial.

23.) At Trial Mr. Laishley did NOT cross examine Deputy swiger in regards to my Statement(s) nor did he raise the issue of such.

24.) Discovery released to Mr. Laishley and Mr.cook contained actual Audio recorded statements made by State's witness "Blondie", Lilly Collins where she clearly stated that, "STAN KILLED JUNIOR", and that "STAN ROBBED THAT JESSE GUY", and also that "STAN HAD MONEY THE MORNING RIGHT AFTER THE ATTACK" and "THAT STAN GAVE JAMES MONEY THE SAME MORNING"...

25.) Mr. Laishley **NEVER** mentioned these Statements or attempted to enter them as to prove that there existed exculpatory statements and neither did he attempt to IMPEACH "Blondie's" testimony with the recorded statements.

26.) Another existing Audio recorded Statement made by James Marcum to Detective stinnent Clearly described the person who allegedly attacked the Victim, Mr. Clay, as being 6 foot 4 inches tall, and weighing approxamtely 270 pounds, I am 5 foot 11 inches tall and only weighed 180 pounds at the time of this event.

27.) Once again, Mr. Laishley never attempted to mention this statement, nor did He try to enter it to the record or attempt to Impeach the state's witness James marcum with this description given to the detective as to the person who "attacked" the Victim.

28.) Mr. Laishley never objected to ANY leading testimony that was being had by Chris Chiles, He actually sat quietly and allowed it.

124

**29.)** Mr.Laishley **NEVER** objected to the State's knowing use of Perjured testimony being had by the State's witness, james marcum in his testifying that "he seen junior get his brains beat out of his head" and that" He actually cleaned up Brains after the eventt" and that the "BAt he was identifying"" was used to beat juniors Brains out of his head", Not only was this testimony allowed to pass unchallenged it was allowed to be exploited by the Prosecution and Mr. Laishley was well aware of the FACT that the Victim had NEVER suffered any type of Head injury that was severe as to the exposure of any brain matter... yet He allowed such Perjured testimony to pass unchallenged.

**30.)** Prior to trial, while preparing to strike Jurors the State had made a final Plea Offer, the gist was that I enter a guilty OR a No Contest Plea to 2Nd degree Murder in return for a 30 year FLAT sentence and the State would dismiss the Burglary and NOT seek the recividist enhancement.

**31.)** at that time Attorney Laishley had me convinced that I had 2 Defenses, Firstly that I did not attack, assault or EVER see the victim and that I was in fact a victim myself and suffered the same type of injuries as the victim, and (2) Assuming that the jury did not accept the fact that I did NOT inflict injuries that were a direct cause of deat to the victim , I could NOT be found guilty, since the actual cause of death was by Cadiac Arrest, not from being beaten as ALL evidence PROVED.

125

<u>32.)</u> In this regard, Mr. Laishley had advised me when the Plea offer was pending that I could not be found guilty of Murder unless the State could prove beyond a reasonable doubt that I had inflicted injuries to the Victim, and that those INJURIES DIRECTLY caused the Death of the Victim.

<u>33.)</u> The Medical evidence in this Case was undisputed, The Victim did **NOT** die directly as a result of injuries inflicted by ME or ANYONE else, instaed the uncontoverted Medical Evidence established the Victim suffered a Heart Attack during an Orthopedic procedure which was necessetated by the victim being beaten.

<u>34.)</u> The way Mr. Laishley explained it to me prior to trial, When the Plea Offer was pending, The state could NOT establish it's burden on the Murder charge, even if the Jury thought I had struck the victim with a bat, So that meant I was looking at a Burglary charge ONLY, with a 1 to 15 year possible prison sentence, Where a No Contest Plea to 2nd degree Murder would have subjected me to a determinate prison term of 30 years Flat.

<u>35.)</u> On that basis I rejected the state's Plea Offer, and proceeded to trial.

<u>36.)</u> After the close of evidenceat trial, which included my testimony, the Court was prepared to issue Jury instructions to the Jury, at this point, the State proposed a So-Called "Jenkins" instruction this instruction was a complete surprize because it was EXACTLY the OPPOSITE of what Mr. laishley had advised to me, according to the "Jenkins" instruction, the Jury could convict me of Murder if it believed that the victim died INDIRECTLY of being beaten, simply by being on an operating table and having a Heart Attack, which IS EXACTLY what happened according to ALL of the Medical Evidence

126

27

And the Expert testimony at trial, including MY expert, and **ONLY** Defense witness, Dr. Touchan, This was completely at odds with mr. Laishley's advice to me, as he ENCOURAGED this TESTIMONY to be given to the Jury by my expert witness, Dr. Touchan in my DEFENSE, I realized at this point that my DEFENSE was NOT a Defense to Murder at all, assuming the Jury did not believe me and my UNCORROBERATED version of events, in the face of the state's witnesses who claimed that I attacked the victim.

<u>37.)</u> I was NOT allowed to take the Plea at this point, as the state had withdrawn it's Offer when the Trial began.

<u>38.)</u> I can STAE unequivically that I would have **CERTAINLY ACCEPTED** <u>the State's Plea offer</u> If Mr. Laishley would have CORRECTLY advised me about the **"JENKINS"** Charge and instruction.

My reasoning is that the jenkins instruction virtually GURANTEED a guilty verdict of 1St degree Murder, If the Jurors believed that I attacked the victim, and there were 2 people who testified to this fact, The verdict exposed me to a LIFE sentence, and due to the nature of the victim's Death, I also realized that I faced a probable outcome of a recomendation of "no mercy" from the Jury, which is EXACTLY what happened.

But I was not worried about this scenerio at all PRIOR to the Court giving the "Jenkins" instruction, Because Mr. Laishley claimed that the state had to prove that the INJURIES INFLICTED by a bat(assuming thought I had inflicted them) HAD to be the DIRECT cause of death and it was UNCONTESTED, Medically, that this did NOT occur.

127

I realize that this sounds like buyers remorse, but I would have never taken a chance like that with my life if Mr. Laishley would have properly advised me that the Court could OR would issue the "Jenkins" instruction, by that time however, the offer was not on the table, I knew that my whole Defense, which consisted of only my testimony and the testimony of Dr.Touchan, who told the Jury that the victim did die from a heart attack was doomed by Attorney Laishley NOT knowing the law.

**39)** On a related note, I was very disappointed that Attorney Laishley did not adequately investigate the history of severe mental disorders or subpoena witnesses, evidence, video and the likes that proved my version of the events, that being I was a victim of an assault and robbery, instaed Attorney Laishley allowed 7 state's witnesses to be paraded on the stand and led around unchallenged, and in fact allowed the State to knowingly present falsified, fabricated, fraudulent, perjured testimony... he NEVER attempted to object to this... It was as if he went from a Defense Lawyer to a Prosecutor in a blink of an eye.

I can not blame the jury for not believing my unsupported testimony, especially since Attorney Laishley did not present any witnesses,evidence, testimony...nothing to support my version of the events.

FURTHERMORE THE AFFIANT SAYETH NAUGHT

Affiant

Sworn to, Taken and Affirmed before me on, 16 /Aug/2016, In Marshall County, W.Va.

NOTARY PUBLIC

My commission expires 05 /Aug /2020/

128



EXHIBIT-MANDAMUS

# [EXHIBIT MANDAMUS]

112



SUPREME COURT OF APPEALS

OFFICE OF THE CLERK

CLERK OF COURT
RORY L. PERRY II
DEPUTY CLERK
EDYTHE NASH GAISER
SENIOR STAFF ATTORNEY
ADRIANA MARSHALL
STAFF ATTORNEY
JORDAN E. MARTIN

STATE CAPITOL, ROOM E-317
1900 KANAWHA BOULEVARD, EAST
CHARLESTON, WV 25305
PHONE: (304) 558-2601
FAX: (304) 558-3815
WEB: WWW.COURTSWV.GOV

August 5, 2016

Edward Dreyfuse
Northern Correctional Center
112 Northern Reg. Correctional Drive
Moundsville, WV 26041

Mr. Dreyfuse:

We received your document entitled "Petition for Writ of Habeas Mandamus." The relief you requested in this matter is the same as the relief sought in Case No. 16-0301. This case constitutes a successive petition and will not be docketed. Therefore I am returning your documents to you.

Sincerely,

Redonna Thompson
Assistant Clerk

*113*

# PETITION FOR WRIT OF HABEAS MANDAMUS

EDWARD JESS DREYFUSE,

    Petitioner,

V.

                              **UNDERLYING CASE NO.: 12-F-232**

HONORABLE PAUL T. FARRELL,

    Respondent,

In the matter of the Petitioner's Pending Habeas Corpus Petition being Suspended and his right(s) to Due Process of Law being Denied and Delayed by the Respondent in violation of;

**The Due Process Clause, Article III, Section 10 of the West Virginia Constitution,**

**Article III, Section. 4 of the West Virginia Constitution,**

**United States Constitution, Article I, § 9,**

**West Virginia Trial Court Rules. Trial Court Rule 16.06,**

**West Virginia Constitution. article. III, § 17,**

**W. Va. Code Jud. Conduct Canon 3A(5);**

As presented and Cited herein.

*114*

# IN THE WEST VIRGINIA SUPREME COURT OF APPEALS

EDWARD JESS DREYFUSE,

       Petitioner,

V.                                          CASE NO.:

HONORABLE PAUL T. FARRELL,

       Respondent,

## PETITION FOR WRIT OF MANDAMUS

    Comes now your Petitioner, Edward Jess Dreyfuse, Pro Se, Moving this Court by Petition, pursuant to **W.Va. Code Annotated Rules of Appellate Procedure, Rule 21.** Writs of mandamus and prohibition, and other extraordinary writs.

    As between mandamus and prohibition, prohibition is the preferred and more appropriate remedy to challenge the actions of a trial court when the allegation is that the trial court was without jurisdiction or was acting beyond its legitimate powers. This is the statutory language **in W. Va. Code § 53-1-1** : A writ of mandamus will not issue unless three elements coexist: **(1)** a clear legal right in the petitioner to the relief sought; **(2)** a legal duty on the part of respondent to do the thing which the petitioner seeks to compel; and **(3)** the absence of another adequate remedy. Mandamus will not be denied because there is another remedy, unless such other remedy is equally beneficial, convenient and effective.

    Mandamus is a proper remedy to require the performance of a nondiscretionary duty by various governmental agencies or bodies. Syl. Pt. 1, **State ex rel. Allstate Ins. Co. v. Union Pub. Serv. Dist.**, 151 W. Va. 207, 151 S.E.2d 102 (1966).

*115*

A writ of mandamus will not issue unless three elements coexist - **(1)** a clear legal right in the petitioner to the relief sought; **(2)** a legal duty on the part of respondent to do the thing which the petitioner seeks to compel; and **(3)** the absence of another adequate remedy." Syl. Pt. 2, **State ex rel. Kucera v. City of Wheeling**, 153 W. Va. 538, 170 S.E.2d 367 (1969).

## RELEVENT FACTS AND PERTINENT ISSUES

**1)** Petitioner filed a Petition for Writ of Habeas Corpus on 1/4/2016 in Cabell County West Virginia

**2)** Petitioner's Habeas Corpus Petition is suspended and under stay due to pending Civil Actions in the United States District Court, Southern District, where Petitioner has proceeded against Judge Paul T. Farrell.

**3)** Petitioner has filed BOTH Writs of Prohibition and Mandamus relating to the above styled Issues without relief.

**4)** Petitioner is suffering the Denial of Numerous Constitutional Rights by the delay being had by Judge Farrell's not recusing himself and suspending the Petitioner's Habeas Proceedings until a final deposition is had in the Pending Federal Action(s) which may in fact take years until finality due to the complex issues being litigated.

116

## LEGAL RELEVENT STANDARDS

**West Virginia State Constitution § 17. Courts Open to All — Justice Administered Speedily;** The courts of this State shall be open, and every person, for an injury done to him, in his person, property or reputation, shall have remedy by due course of law; and justice shall be administered without sale, denial or delay.

It is misconduct for a judge to unreasonably delay resolving a case. Under **W. Va. Const. art. III, § 17,** which provides that justice shall be administered without sale, denial or delay, and under **W. Va. Code Jud. Conduct Canon 3A(5)** , which provides that a judge should dispose promptly of the business of the court, judges have an affirmative duty to render timely decisions on matters properly submitted within a reasonable time following their submission.

This Court has also pointed out that "judges have an affirmative duty to render timely decisions on matters properly submitted within a reasonable time following their submission." Syllabus point 1, in part, **State ex rel. Patterson v. Aldredge**, 173 W. Va. 446, 317 S.E.2d 805 (1984). The duty of judges to issue timely decisions is also clearly set forth in **the West Virginia Trial Court Rules. Trial Court Rule 16.06** directs that in Domestic Relations Proceedings "[A]n order shall be entered on post-hearing motions within one month of submission."

Pursuant to **Trial Court Rule 16.13** it is the duty of the judges to effectuate expeditious movement and timely disposition of all cases assigned to them.

The post-conviction remedy sought by the petitioner is specifically provided for in **West Virginia Code § 53-4A-1** et seq., and is further guaranteed by **West Virginia Constitution, Article III, § 4:** "The privilege of the writ of habeas corpus shall not be suspended.

113

The Due Process Clause,  **Article III, Section 10 of the West Virginia Constitution**, requires procedural safeguards against State action which affects a liberty or property interest." Syllabus Point 1, **Waite v. Civil Service Commission,** 161 W. Va. 154, 241 S.E.2d 164 (1977). Due process of law means "the due course of legal proceedings according to those rules and forms, which have been established for the protection of private rights, securing to every person a judicial trial before he can be deprived of life, liberty or property." Syllabus Pont 8, **Peerce v. Kitzmiller,** 19 W. Va. 564 (1882).

In addition to its common law roots, the writ of habeas corpus acquired constitutional dimensions in the sense that its privilege cannot be suspended by the Federal government except in certain extreme cases.  **United States Constitution, Article I, § 9, cl. 2. 3** In this State the privilege of the writ is even more absolute as "the privilege of the writ of habeas corpus shall not be suspended." West Virginia Constitution, **Article III, Section 4**.  Finally, **under Chapter 53, Article 4A, Section 1 et seq. of the West Virginia Code** , as amended, certain procedural modifications have been made in regard to the courts' jurisdiction of the writ.

The United States Supreme Court has made it clear that the writ of habeas corpus, because of its broad availability to challenge confinement contrary to the Constitution, cannot be limited to a particular {239 S.E.2d 141} form of remedial relief.  **Prieser v. Rodriguez,** supra; 5 **Peyton v. Rowe**, 391 U.S. 54, 20 L. Ed. 2d 426, 88 S. Ct. 1549 (1968); **Irvin v. Dowd**, 366 U.S. 717, 6 L. Ed. 2d 751, 81 S. Ct. 1639 (1961).

Furthermore, the State may not deprive prisoners . . . of their right to habeas corpus review of the legality of their confinement[.]" Syl. pt. 1, in part**, Tasker v. Griffith**, 160 W. Va. 739, 238 S.E.2d 229 (1977). See also  State ex rel**. Titus v. Hayes**, 150 W. Va. 151, 159, 144 S.E.2d 502, 508 (1965) ("The primary object of habeas corpus is to determine the legality of the restraint under which a person is held[.]");

*108*

**State ex rel. Nutter v. Mace**, 130 W. Va. 676, 44 S.E.2d 851 (1947) ("If the process or proceeding under which the complaining party is confined or restrained is void a writ of habeas corpus is the proper remedy to invoke."). Indeed, pursuant to Art. 3, Sec. 4 of the state constitution, it is held that "the privilege of the writ of habeas corpus shall not be suspended." See **Rhodes v. Leverette**, 160 W. Va. 781, 787, 239 S.E.2d 136, 140 (1977) ("In this State the privilege of the writ is even more absolute as 'the privilege of the writ of habeas corpus shall not be suspended.'");

**State ex rel. Burgett v. Oakley,** 155 W. Va. 276, 279, 184 S.E.2d 318, 320 (1971) ("The writ of habeas corpus is . . . guaranteed by both the federal and State Constitutions."); **State ex rel. Nutter v. Mace**, 130 W. Va. 676, 685, 44 S.E.2d 851, 855 (1947) (Fox, J., dissenting) ("Thus we have the writ so firmly established in our law that it cannot be repealed or suspended by our State Legislature[.]"); **Ex parte Jones**, 71 W. Va. 567, 610, 77 S.E. 1029, 1047 (1913) (Robinson, J., dissenting) ("The people ordained that the privilege of the writ of habeas corpus should never under any circumstances be suspended.").

### CONCLUSION/RELIEF(S) SOUGHT

Petitioner herein prays that this Honorable Court GRANT the Petition as it has been offered by the presentment of a Writ of Mandamus and offers the following in support of meeting the requirements for the Court to GRANT this Petition;

(1) a clear legal right in the petitioner to the relief sought; that being the Constitutional Right to file a Petition for writ of Habeas Corpus and that justice shall be administered without sale, denial or delay, and also as the privilege of the writ of habeas corpus shall not be suspended.

(2) a legal duty on the part of respondent to do the thing which the petitioner seeks to compel; that being the Recusal of Judge Paul T. Farrell from deciding the Petition for Writ of Habeas

Corpus in which Petitioner filed more than 6 months ago and has been wrongfully

Suspended and Delayed by Judge Farrell in direct Violation of ALL of the Relevant Legal

Standards presented.

**(3)** The absence of another adequate remedy; The Petitioner herein offers this

Petition for decision to the Honorable West Virginia Supreme Court of Appeals as no other

remedy is available since his Petition for Writ of Habeas Corpus is under an illegal suspension

and stay which is denying the Petitioner his Constitutional right(s) of Due Process of Law and

Equal Protection of such.

Petitioner herein prays this Honorable Court will GRANT the Petition as it is offered and ORDER

that Justice be served without Delay, Denial or the Suspension of the Petitioner's Habeas Corpus

Petition Pending in Cabell County West Virginia, and also ORDER Judge Paul T. Farrell to excuse himself

from deciding ANY Case or Action which involves the Petitioner, and should Judge Paul T. Farrell NOT

remove himself from the Petitioner's pending Habeas Petition, have him show cause as to why the

Petitioner should be denied the right to Due Process and the Suspension of his right to a Habeas Corpus

proceeding as guaranteed by the Due Process Clause, **Article III, Section 10 of the West Virginia**

**Constitution, Article III, Sec. 4 of the state constitution,** and **United States Constitution, Article I, § 9,**

Petitioner, Pro-Se

Sworn to, Taken and Affirmed before me on ___20___/2016, In Marshall County, W.Va.,

NOTARY PUBLIC

My commission expires _____



OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
JAMES W. HENSEL, III
Northern Correctional Facility
112 Northern Regional Correctional Drive
Moundsville, West Virginia 26041
My Commission Expires Aug. 5, 2020

12b